1997 SD 96

Daniel G. TIPTON, Conservator of the Estate of Crystal R. Tipton, A Minor; Daniel G. Tipton, Conservator of the Estate of Daniel E. Tipton, A Minor; Daniel G. Tipton, Individually, and Lisa M. Tipton, Plaintiffs and Appellants,

v.

TOWN OF TABOR, South Dakota and Bon Homme County, South Dakota and Their Officers, Agents and Employees; N.L. Mach; Leonard Cimpl; Donald Fejfar; Donald Koranda; Alvin Sternhagen; Doris F. Muller; Eugene Sutera and Lyle O'Donnell, Defendants and Appellees.

No. 19631.

Supreme Court of South Dakota.

Argued Dec. 4, 1996.

Decided July 23, 1997.

Rehearing Denied Aug. 28, 1997.

Gerald L. Reade of Brady & Reade, Yankton, for Plaintiffs and Appellants.

John Simko, Tim R. Shattuck of Woods, Fuller, Shultz & Smith, Sioux Falls, for Defendants and Appellees Town of Tabor, N.L. Mach, Leonard Cimpl, Donald Fejfar, Donald Koranda, Alvin Sternhagen, Doris F. Muller and Eugene Sutera.

Douglas M. Deibert of Cadwell, Sanford, Deibert & Garry, Sioux Falls, for Defendants and Appellees Bon Homme County and Lyle O'Donnell.

KONENKAMP, Justice.

[¶ 1] We are again faced with the question whether city and county officials owed a "special duty" to protect four-year-old Crystal Tipton who was severely mauled when she strayed into an nearby yard and approached a cage holding two wolfdog hybrids. Following remand in the earlier appeal, the circuit court, applying our new standard, granted summary judgment, concluding as a matter of law no special duty affixed. Although existence of a special duty is a question of law, ordinarily breach of duty is a question of fact for a jury. Nonetheless, we conclude summary judgment was proper as none of the required special duty factors were established here.

**Procedural Background**

[¶ 2] Daniel G. Tipton, his wife, Lisa Tipton, and their children, Crystal and Daniel E. Tipton, sued the Town of Tabor, Bon Homme County, and certain government employees after Crystal was mauled by Kenneth Holland's wolfdogs. Summary judgment was granted to the defendants on the issue of liability. On appeal, we reversed and remanded "for further consideration by the trial court" in view of our revised test. *Tipton v. Town of Tabor*, 538 N.W.2d 783, 788 (S.D.1995)(*Tipton I* ).

**Facts**

[¶ 3] In 1987, Kenneth Holland purchased two wolf-German Shepherd hybrids (*Canis lupus* crossed with *Canis familiaris* ). They were reputedly close to ninety-five percent wolf, the product of six or seven generations of crossbreeding. From their appearance and behavior, it was evident they had wolf-like characteristics. For almost three years, Holland kept them in his back yard in Tabor in a secure, fenced enclosure. This pen was constructed of chain link fence on two sides and livestock panels on the other two sides. It had wire buried under the surface to prevent the animals from digging out. Three feet of wire all around the top prevented them from jumping or climbing over. As they had a "nervous" disposition, the hybrids were never allowed to run free, and Holland recommended to persons interested in seeing them that they visit only when he was present. Openings in the fencing were wide enough to allow the wolfdogs to stick at least part of their heads out in some places and fully out in others. Holland believed his wolfdogs would never attack anyone unless provoked. He kept them in the secure cage for "bonding" purposes. The animals were male and female; their pups lived in an adjoining cage.

[¶ 4] Some people in the community had concerns about the safety of their children, but for a variety of reasons, no one complained to law enforcement authorities, including Chief of Police Eugene Sutera or County Sheriff Lyle O'Donnell, about anything other than being disturbed by howling.[1] In February 1989, Doris Muller, the town Finance Officer, issued licenses for "wolf hybrids" to Teresa Holland, Kenneth's wife, in accordance with a town ordinance and based on a veterinarian's rabies vaccination receipt for six animals: "3 wolf & 3 dogs." Muller informed the Town Board of the licensure. At the end of 1989, the licenses expired, and, in 1990, Kenneth Holland appeared before the Board to declare he would no longer license his animals because he believed the licensing ordinances were not being enforced.[2] Both Sutera and O'Donnell examined the pen and the wolfdogs at some point

---

1. Some of the neighbors were new to town and felt uncomfortable about complaining. Depositions from town residents and officials reveal that residents would not complain to the Board about their fears regarding the hybrids because they were concerned about "rocking the boat" or being known as troublemakers.

2. Holland had made a written complaint about a dog running at large, and he believed nothing had been done about it.

before the mauling, but did so only in response to concerns about howling. Both looked into state and local enactments covering possession of such animals, but felt no laws precluded keeping wolfdogs, especially as they were securely controlled in their pen.

[¶ 5] On November 12, 1990, the Tiptons were in Tabor visiting relatives who lived near the Hollands. Crystal, four years old at the time, wandered into Hollands' yard, over to the hybrids' pen. The animals apparently grabbed her as she stood near their enclosure. She was severely mauled. The Tiptons, who were uninsured, incurred over $33,000 in medical expenses for Crystal's care. Soon after the incident, the Hollands discharged their liability through bankruptcy. In their suit, the Tiptons assert (1) Tabor was negligent in licensing the hybrids, violating town ordinances, which increased the risk of harm to others and created a nuisance; (2) Tabor was negligent in allowing the hybrids to remain in town knowing of the danger; and (3) the county was negligent in not abating the nuisance the hybrids presented as witnessed by Sheriff O'Donnell who had actual knowledge of the hybrids' vicious proclivities.

[¶ 6] In *Tipton I*, we modified the bright-line test in *Hagen v. City of Sioux Falls*, 464 N.W.2d 396, 399 (S.D.1990), which relied solely upon statutory language to ascertain the existence of a special duty to protect a person or class of persons. *Tipton I*, 538 N.W.2d at 787. For the *Hagen* analysis, we substituted the four-part test found in *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn.1979), making "any combination" of the following four factors determinative in assessing the existence of a special duty: (1) actual knowledge of the dangerous condition; (2) reasonable reliance by persons on official representations and conduct; (3) an ordinance or statute setting forth mandatory acts clearly for the protection of a particular class of persons rather than the general public; and (4) failure to use due care to avoid increasing the risk of harm. *Id.* (citing *Cracraft*, 279 N.W.2d at 806–07). "Whether a special duty has been breached is generally a question for the jury to decide." *De Long v. County of Erie*, 60 N.Y.S.2d 296, 469

N.Y.S.2d 611, 616, 457 N.E.2d 717, 722 (1983). The trial court again granted summary judgment to the defendants and the Tiptons appeal.

## Standard of Review

[¶ 7] "In reviewing a grant of summary judgment, we must decide whether the moving party has shown there is no genuine issue of material fact and is entitled to judgment as a matter of law; the evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." *Great West Cas. Co. v. Bergeson*, 1996 SD 73, ¶ 5, 550 N.W.2d 418, 419 (citing *Nelson v. WEB Water Development Ass'n., Inc.*, 507 N.W.2d 691, 693–94 (S.D.1993); *Pickering v. Pickering*, 434 N.W.2d 758, 760 (S.D.1989)); *Klatt v. Continental Ins. Co.*, 409 N.W.2d 366, 368 (S.D.1987); *Wilson v. Great Northern Ry.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). "When a motion for summary judgment is made and supported as provided in § 15–6–56, an adverse party may not rest upon the mere allegations or denials" in the pleadings, but must present specifics showing genuine, material fact issues for trial. SDCL 15–6–56(e). Our task on appeal is to determine only whether issues of material fact exist and whether the law was correctly applied. *Moss v. Guttormson*, 1996 SD 76, ¶ 5, 551 N.W.2d 14, 16; *Flynn v. Lockhart*, 526 N.W.2d 743, 745 (S.D.1995). If any legal basis emerges to support summary judgment, we must affirm. *Sparagon v. Native American Publishers, Inc.*, 1996 SD 3, ¶ 33, 542 N.W.2d 125, 133.

## Analysis and Decision

[¶ 8] **The Public Duty Doctrine—Rationale**

[¶ 9] Recognizing a need for redress when local government torts result in injury, our Legislature conditionally waived sovereign immunity. "To the extent that any public entity, other than the state, participates in a risk sharing pool or purchases liability insurance ... the public entity shall be deemed to have waived the common law doctrine of sovereign immunity...." SDCL 21–32A–1. Despite this waiver, however, South Dakota continues to observe the public

duty rule, as do most jurisdictions abrogating immunity. *Catone v. Medberry*, 555 A.2d 328, 331 (R.I.1989)(citing cases).

[¶ 10] Essentially, the rule declares government owes a duty of protection to the public, not to particular persons or classes.[3] Sound reasons support this doctrine. Furnishing public safety always involves allocating limited resources. Law enforcement entails more than simply reacting to violations; it encompasses the art of keeping the peace. Deploying finite resources to achieve these goals is a legislative and executive policy function. To allow individuals to influence through private litigation how resources must be disposed would render government administration chaotic and enfeebled. Unrestricted liability might discourage communities from acting at all or encourage action merely to avoid suit, without regard to the common good.[4] The rule promotes accounta-

bility for offenders, rather than police who through mistake fail to thwart offenses. Otherwise, lawbreaker culpability becomes increasingly irrelevant with liability focused not on the true malefactors, but on local governments. A "public duty" conception acknowledges that many "enactments and regulations are intended only for the purpose of securing to individuals the enjoyment of rights and privileges to which they are entitled as members of the public, rather than for the purpose of protecting any individual from harm." *Restatement (Second) of Torts* § 288 cmt. b (1965).

[¶ 11] Some have criticized this doctrine for perpetuating formerly repealed immunity.[5] A few courts have taken it upon themselves to repudiate the rule.[6] To be sure, competing policy considerations are at stake.[7] Upholding this rule, however, involves mat-

---

3. The public duty doctrine seemingly has its origin in the United States Supreme Court decision of *South v. Maryland*, 59 U.S. (18 How) 396, 403, 15 L.Ed. 433 (1855)(powers and duties of sheriff are by nature public duties "for neglect of which [the sheriff] is amenable to the public, and punishable by indictment only"). *See also Shearer v. Town of Gulf Shores*, 454 So.2d 978, 979 (Ala. 1984); *Commerce & Industry Ins. v. Toledo*, 45 Ohio St.3d 96, 543 N.E.2d 1188, 1194 (1989); *Sorichetti v. City of New York*, 65 N.Y.2d 461, 492 N.Y.S.2d 591, 596, 482 N.E.2d 70, 75 (1985); *Riss v. City of New York*, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 898–99, 240 N.E.2d 860, 861 (1968); *Braswell v. Braswell*, 330 N.C. 363, 410 S.E.2d 897, 901 (1991); John H. Derrick, Annotation, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory that Only General, not Particular, Duty Was Owed Under Circumstances*, 38 A.L.R.4th 1194 (1985). "[A] public official's duty is owed to the public and not to any specific individual in society." *Makris v. City of Grosse Pointe Park*, 180 Mich. App. 545, 448 N.W.2d 352, 358 (1989). This is not to be confused with "run of the mill" officer negligence. *Arnold v. Village of Chicago Ridge*, 181 Ill.App.3d 778, 130 Ill.Dec. 494, 537 N.E.2d 823 (1989)(child injured by police car involved in high speed chase of stop sign violator; special duty need not be shown to establish municipal liability); *Boyer v. State*, 323 Md. 558, 594 A.2d 121 (1991)(no private duty exception in not apprehending drunk driver, but public duty rule inapplicable to operating motor vehicle negligently).

4. *See Ezell v. Cockrell*, 902 S.W.2d 394, 398 (Tenn.1995).

5. Critics of the rule state, "A duty to all ... is a duty to none." *Leake v. Cain*, 720 P.2d 152, 159

(Colo.1986)(abolishing the public duty rule, but finding no negligence); *see also Catone v. Medberry*, 555 A.2d 328, 331 n. 1 (R.I.1989)(quoting Lambert, *Governmental Immunity and Liability— Police Liability for Negligent Failure to Prevent Crime*, 27 ATLA LRep 386, 387 (Nov 1984)).

6. *See, e.g., Ryan v. State*, 134 Ariz. 308, 656 P.2d 597, 599 (1982); *Leake*, 720 P.2d at 160; *Commercial Carrier Corp. v. Indian River Cty.*, 371 So.2d 1010, 1016 (Fla.1979)(public duty rule does not survive legislative abrogation of sovereign immunity); *Jean W. v. Commonwealth*, 414 Mass. 496, 610 N.E.2d 305, 307 (1993)(announcing doctrine to be abrogated in the future); *Doucette v. Town of Bristol*, 138 N.H. 205, 635 A.2d 1387, 1390 (1993)(abolishing the defense for cities); *Brennen v. City of Eugene*, 285 Or. 401, 591 P.2d 719, 725 (1979)(public duty rule falls with abrogation of immunity). Some of these jurisdictions nonetheless have limits on the right to sue. *Benson v. Kutsch*, 181 W.Va. 1, 380 S.E.2d 36, 38 (1989)(citing cases).

7. *See Shore v. Town of Stonington*, 187 Conn. 147, 444 A.2d 1379, 1382 (1982)(public—private duty rule borne of many policy considerations leading law to decide if certain interests are entitled to protection against official conduct). A countervailing policy consideration holds:

   [I]mposing liability on police merely provides an incentive for law enforcement officers to perform their preexisting job responsibilities adequately.... By modifying their practices where necessary, police will increase public confidence in law enforcement agencies.

   Note, *Government Liability and the Public Duty Doctrine*, 32 VillLRev 505, 530, 538–40 (1987).

ters altogether different from a mere litigation cost-benefit analysis, a function our Legislature has now apparently resolved by waiving immunity where insurance coverage exists. Yet absent legislative preemption, courts still decide the existence of duty, as it is "entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law...." W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 37, at 236 (5th ed 1984); *City of Colton v. Schwebach*, 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771; *Restatement (Second) of Torts* § 328B (1965). In carrying out our responsibility to ascertain duty, we must ponder the nature of government's relation to its citizens and ask to what extent it should and can tolerate accountability for the negligence and misdeeds of third persons.[8] Logically, without restriction on the scope of responsibility, local governments could be exposed to potential liability for every failure to appropriately enforce some enactment. Law enforcement officials would be put in the position of guaranteeing protection to each community member. "[S]o vast an expansion of the duty of protection should not emanate from the judi-

cial branch." *Kircher v. City of Jamestown*, 74 N.Y.2d 251, 544 N.Y.S.2d 995, 1000, 543 N.E.2d 443, 448 (1989).

[¶ 12] Though some consider this doctrine a form of immunity, we view the rule principally within the framework of duty—if none exists, then no liability may affix.[9] When our Legislature waived immunity for public entities, it created no new causes of action, but only imposed upon those entities basically the same liability in tort individuals bear. Local governments will not ordinarily be liable for the conduct of third parties where private persons are not.[10] Generally, the law imposes "no duty to prevent the misconduct of a third person." *Cracraft*, 279 N.W.2d at 804. Tort liability depends upon the existence and breach of duty, and unless a specific statute creates a legal obligation, ascertaining a duty and defining its limitations, as we have said, remain a function of the courts. "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Keeton et al., *supra*, § 53, at 356.[11]

8. "The rule embodies the conclusion that a police department's negligence—its oversights, blunders, omissions—is not the proximate or legal cause of harms committed by others. Proximate cause is duty's twin: each concept may be restated in terms of the other, and expressing the problem in terms of duty underscores the policy issues underlying the decision whether to find a duty. The existence of a duty ultimately depends upon choices between competing policies." 2 S. Speiser, et al., *The American Law of Torts* § 6:11 n45 (1985 & 1997 Supp) (citations and internal citations omitted).

9. "Absence of duty is a particularly useful and conceptually more satisfactory rationale where, absent any 'special relationship' between the officers and the plaintiff, the alleged tort consists merely in police nonfeasance." *Davidson v. City of Westminster*, 32 Cal.3d 197, 185 Cal.Rptr. 252, 254, 649 P.2d 894, 896 (1982). "The public duty rule is not technically grounded in government immunity, though it achieves much the same results. Unlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was an enforceable duty to the plaintiff in the first place." 18 E. McQuillin, *The Law of Municipal Corporations* § 53.04.25, at 165 (3d ed 1993)(citing *Benson, supra; Davidson, supra*.) [*See also White v. Beas-*

*ley,*] 453 Mich. 308, 552 N.W.2d 1 (1996); *Sawicki v. Village of Ottawa Hills*, 37 Ohio St.3d 222, 525 N.E.2d 468 (1988); *but see Adams v. State*, 555 P.2d 235, 241 (Alaska 1976)(doctrine is a form of immunity).

10. As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' (Rest. 2d Torts (1965) § 315; *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 751–752, 167 Cal.Rptr. 70, 614 P.2d 728; *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334.).

*Davidson*, 185 Cal.Rptr. at 255, 649 P.2d at 897.

11. Yet Prosser concedes duty is not a concept capable of precise definition: "No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 359 (5th ed 1984).

[¶ 13] A widely accepted corollary to the public duty doctrine is the "special duty" or "special relationship" rule.[12] *See Restatement of Torts (Second)* § 315 (1965). To establish liability under this restrictive template, plaintiffs must show a breach of some duty owed to them as individuals. The reason justifying this exception holds that when a public entity acts on behalf of a particular person actively causing injury, the law may impose liability because the government has by its conduct already made a policy decision to deploy its resources to protect such individual.[13] This exception is not peculiar to the public duty rule; it follows the tort principle, most suitable with respect to rendering service to another, that persons are generally not liable for failure to act, but once having acted, must proceed without negligence. *See generally Restatement (Second) of Torts* § 324A (1965); *Davidson v. City of Westminster*, 32 Cal.3d 197, 185 Cal.Rptr. 252, 649 P.2d 894 (1982). While many plaintiffs have invoked the special duty rule to support claims against public entities, most courts have found no liability for matters such as failure to adequately inspect a structure for violations of fire and building codes, *Benson v. Kutsch*, 181 W.Va. 1, 380 S.E.2d 36, 40 (1989)(citing cases); failure to solve crime, *Von Batsch v. American Dist. Telegraph Co.*, 175 Cal.App.3d 1111, 222 Cal.Rptr. 239 (1985); or failure to apprehend drunk drivers who later injure others. James L. Isham, Annotation, *Failure to Restrain Drunk Driver as Ground of Liability of State or Local Government Unit or Officer*, 48 A.L.R.4th 320 (1986).

**12.** Different tests have been formulated to determine special duty. Several jurisdictions follow the four-part analysis in *Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 374–75, 505 N.E.2d 937, 940 (1987)(all four elements must be met); *City of Rome v. Jordan*, 263 Ga. 26, 426 S.E.2d 861, 863 (1993)(modified Cuffy test where three elements must be met); *White, supra* (Cuffy test); *Campbell v. City of Bellevue*, 85 Wash.2d 1, 530 P.2d 234 (1975)(four separate exceptions to public duty rule, liability may arise under a single factor such as actual knowledge; but only where agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and plaintiff is within the class the statute is intended to protect ("failure to enforce" exception)). Un-

## [¶ 14]  Application of the Rule

[¶ 15] On remand, the circuit court applied our four-element analysis from *Tipton I*— actual knowledge, reliance, ordinance enacted for the protection of a particular class of persons, aggravation of harm—and concluded the Tiptons failed to satisfy any factor with requisite "strong evidence." *See Tipton I*, 538 N.W.2d at 787 ("Strong evidence concerning any combination of these [*Cracraft*] factors may be sufficient to impose liability on a government entity."). We now examine each of the four elements in a light most favorable to plaintiffs.

### [¶ 16]  1.  Actual Knowledge of Dangerous Condition

[¶ 17] "Actual knowledge" means knowledge of "a violation of law constituting a dangerous condition." *Hage v. Stade*, 304 N.W.2d 283, 288 n. 2 (Minn.1981). Constructive knowledge is insufficient: a public entity must be uniquely aware of the particular danger or risk to which a plaintiff is exposed. *Arnold v. Village of Chicago Ridge*, 181 Ill. App.3d 778, 130 Ill.Dec. 494, 497, 537 N.E.2d 823, 826 (1989). It means knowing inaction could lead to harm. *See Lorshbough v. Township of Buzzle*, 258 N.W.2d 96, 99–102 (Minn.1977)(decided before Minnesota's present public duty rule as espoused in *Cracraft*; county's actual knowledge of dangerous condition in government-operated dump created a special relationship between city and injured property owners). Actual knowledge goes beyond simple failure to perceive a violation. *Runkel v. New York*, 282 A.D. 173,

like many tests, the *Cracraft* analysis allows considerable flexibility, if less predictability, by not requiring all four factors in order to sustain private duty liability. *Cracraft's* factors create "no bright line," as each situation requires its own analysis and "other relevant factors" may be helpful. *Andrade v. Ellefson*, 391 N.W.2d 836, 841 (Minn.1986).

**13.** Cardozo enunciated a similar principle: "If conduct has gone forward to such a stage that in action [sic] would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward." *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896, 898 (1928).

123 N.Y.S.2d 485, 488 (1953)(pre-*Cuffy* rule case defining actual knowledge: specific knowledge of code violations and failure to abate abandoned open structure "so rotted and dilapidated" it was in "imminent danger of collapse," forming a trap or a "dangerous instrumentality" which is in the "same class as an explosive substance, inflammable material, a live electric wire or a spring gun"— also ordinance created mandatory duty for benefit of particular class).

[¶ 18] As foreseeability is a necessary element in the duty formulation, actual knowledge denotes a foreseeable plaintiff with a foreseeable injury. *Mid–Western Elec., Inc. v. DeWild Grant Reckert,* 500 N.W.2d 250, 254 (S.D.1993). Public officers must have subjective knowledge of the violation, but "knowledge of facts constituting the statutory violation, rather than knowledge of the statutory violation itself, is all that is required." *Coffel v. Clallam County,* 58 Wash.App. 517, 794 P.2d 513, 517 (1990)(police are presumed to know the penal law). In *Livingston v. City of Everett,* 50 Wash. App. 655, 751 P.2d 1199 (1988), a four-year-old boy was bitten and scratched by Doberman Pinschers. In reversing summary judgment for the city, the court found genuine issues of material fact on whether the city had breached a special duty to protect the child based on evidence the Animal Control Department had received complaints about the dogs biting and lunging at persons and running loose. With these reports, the city had notice at least one dog was dangerous, thus its animal control officers may have possessed "actual knowledge of a statutory violation" and failed "to take corrective action despite a statutory duty to do so, and the plaintiff was within the class the statute intended to protect...." *Id.,* 751 P.2d at 1200 (citations omitted). Although actual knowledge may be shown by both direct and circumstantial evidence, it may not be established through speculation. *Uccello v. Laudenslayer,* 44 Cal.App.3d 504, 118 Cal.Rptr. 741, 748 n. 4 (1975)(referring to knowledge necessary to put landlord on notice of a

vicious dog on leased premises). "Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." *Id. See also Minick v. Englert,* 84 S.D. 73, 79, 167 N.W.2d 551, 555 (1969)(detour warning signs, barricades and flares gave actual knowledge: "There was no obstruction or impairment of visibility and no reasonable excuse for defendant's failure to see the signs and the approaching hazard."). In sum, actual knowledge imports "knowing" rather than "reason for knowing."

[¶ 19] The circuit court found, as a matter of law, defendants had no actual knowledge about the hybrids' dangerous propensities. As we noted in *Tipton I,* the existence of actual knowledge is in "sharp dispute" and is perhaps the overarching consideration here, most bolstered by evidentiary support. The Tiptons allege several circumstances became apparent to Sutera and O'Donnell through their investigations, generating actual knowledge about the wolfdogs' viciousness. Solidly reinforced and over seven feet tall, the very structure of the pen suggested contact with the creatures it held may be dangerous.[14] *Ford v. Steindon,* 35 Misc.2d 339, 232 N.Y.S.2d 473, 474 (1962)(citing cases)(manner in which dog tied up and precautions taken to restrain it evince knowledge of its vicious propensities). *See also Radoff v. Hunter,* 158 Cal.App.2d 770, 323 P.2d 202, 204 (1958)(animal confined in a manner appropriate for dangerous beast); *Barger v. Jimerson,* 130 Colo. 459, 276 P.2d 744 (1954); *Layman v. Atwood,* 175 Ind.App. 176, 370 N.E.2d 933 (1977). These cases all refer to knowledge on the part of owners. Yet can we advance this as actual knowledge by defendants? They did not build the cage, and other than their observations of it and the animals within, had no subjective information on why the cage was so constructed. Holland had previous experience in raising wolfdogs and represented them to be safe.

14. "Danger and physical harm are not of necessity screened out by the presence of a barrier if that barrier is in some way surmountable or permits the threat of danger." *Machacado v.*

*City of New York,* 80 Misc.2d 889, 365 N.Y.S.2d 974, 979–80 (N.Y.Sup.Ct.1975)(German Shepherd).

[¶ 20] The hybrids were never allowed to run loose, although they could stick their heads out of the cage through the livestock panels. They looked somewhat like wolves and, to a certain extent, behaved as wolves. Neighbors were verbally discouraged from approaching the pens, although there was no yard fence or guard rail around the pen preventing close contact. Neighborhood and community discussion about the animals centered on keeping children away from the pen, but no one ever made a complaint about any danger the animals posed.

[¶ 21] Tabor's licenses described the animals as "wolf hybrids," yet the rabies receipt witnessed by Muller referred to each as a "wolf." Muller understood the animals to be wolf hybrids, not wolves, and she so informed the Town Board: "I told them just what [Mrs. Holland] had told me. They were called wolf hybrids." Shortly before the attack, Tabor sought to change its licensing ordinance to specifically address wild animals, but there is contradictory evidence on whether this was in response to the wolfdogs.[15] Nonetheless, of those who said the new ordinance was in part a reaction to the wolfdogs, the only concern they raised was the annoyance from howling. No one ex-

pressed to the Town Board any concern about safety. Although controversy persists over what subjectively prompted O'Donnell and Sutera to investigate the hybrids, they insist it was only in response to complaints about howling.[16]

[¶ 22] To Tabor and Bon Homme's knowledge, the hybrids had never bitten or snapped at anyone who had approached the cage. Before the attack on Crystal, the animals were nothing more than a community curiosity and annoyance. If their ancestry engendered concerns about viciousness, the record reflects no history of problems with these particular animals. "Warning flags," as the Minnesota Supreme Court has noted, are not enough for actual knowledge under *Cracraft*. *Andrade v. Ellefson*, 391 N.W.2d 836, 842 (Minn.1986). At least at the time of the attack, there is no support in the record for the assertion there was actual knowledge wolfdog hybrids were more dangerous than other dogs. Nonetheless, the Tiptons offered information about the special dangers of wolf hybrids from such sources as *Newsweek*, *The Sioux Falls Argus Leader*, and *Wolftracks*, a publication of Wolf Haven America.[17] These articles raise serious con-

---

15. The new ordinance read, in part, "It shall be unlawful for any person to raise, keep or maintain, or permit to run at large, ... any wild animal or animals, within any area of the city ... notwithstanding the fact that any such animals or poultry may be maintained in an enclosed area on private property." Town of Tabor Ordinance § 8–1101. The old ordinance, the one which we determined in *Tipton I* was in force at the time of the attack, read, "No dog of fierce, dangerous or vicious propensities, licensed or not, shall be harbored or kept within the town." Ordinance § 8–1108. *See Tipton I*, 538 N.W.2d at 786 n2 *and* SDCL 9–29–12: "Every municipality shall have power to regulate or prohibit the running at large of dogs, animals, and poultry, to establish pounds, appoint poundmasters, and regulate the impounding of animals, and to impose a tax or license on dogs running at large." As we noted in *Tipton I*, "These laws present two related issues: (1) whether Town assumed a special duty to enforce its prohibition on dogs 'of fierce, dangerous or vicious propensities' and (2) whether County assumed a special duty to 'take possession of any animal suspected of being dangerous.'" *Tipton I*, 538 N.W.2d at 786 (considering SDCL 7–12–29 and Ordinance § 8–1108).

16. With actual knowledge of a violation constituting a dangerous condition, liability will not

attach for "failure to enforce" unless the officer failed to take action " 'commensurate with the risk involved.'" *Campbell*, 530 P.2d at 240 (quoting *Runkel, supra*). City and county officials would have "only a limited duty of care to act reasonably within the framework of the [governing ordinances] and the economic resources available.... In determining whether a municipality's act or failure to act was unreasonable, the trier of fact can take into account the municipality's available resources and its resource allocation policy." *Bailey v. Town of Forks*, 108 Wash.2d 262, 737 P.2d 1257, 1261 (1987).

17. The April 29, 1991, *Newsweek* article quoted wolf expert, Steve Kuntz, saying wolfdogs "make horrible pets," often "schizophrenic—sometimes Lassie, sometimes Cujo. Getting too close to one is a gamble. This animal is going to make the pit bull seem like a puppy." *Newsweek* on August 12, 1991, reported that Randall Lockwood, a wolf behavior expert, stated wolf hybrids are "predators at heart." The same article reported that in the three prior years, six children had been killed by wolfdog pets and many more were mauled. *Wolftracks* (Spring 1991), a publication of Wolf Haven America, a nonprofit educational and scientific organization promoting wolf survival, stated:

cerns about keeping wolfdogs as pets, particularly in town. However, our quandary with this is twofold: (1) the articles were all published sometime after the attack on Crystal Tipton; and (2) there is no showing that Sutera, O'Donnell, or other employees of Tabor or Bon Homme were ever aware of this information. In truth, only in recent years has public awareness been raised about the hazards of maintaining wolf hybrids, especially by irresponsible owners.

██ [¶ 23] Tabor's ordinance in effect at the time forbade keeping dogs of fierce, dangerous or vicious propensities. Owning or keeping vicious dogs also constitutes a public nuisance under state law. SDCL 40–34–13. South Dakota law provides the following definition:

> For the purposes of §§ 40–34–13 to 40–34–15, inclusive, a vicious dog is:
>
> (1) Any dog which, when unprovoked, in a vicious or terrorizing manner approaches in apparent attitude of attack, or bites, inflicts injury, assaults or otherwise attacks a human being upon the streets, sidewalks or any public grounds or places; or
>
> (2) Any dog which, on private property, when unprovoked, in a vicious or terrifying manner approaches in apparent attitude of attack, or bites, or inflicts injury, or otherwise attacks a mailman, meter reader, serviceman, journeyman, delivery man, or other employed person who is on private property by reason of permission of the owner or occupant of such property or who is on private property by reason of a course of dealing with the owner of such private property.

SDCL 40–34–14. *But see* SDCL 40–34–15 ("No dog may be declared vicious if an injury or damage is sustained to any person who was committing a willful trespass...."). Other jurisdictions have arrived at similar definitions:

> The terms "vicious propensities" and "dangerous propensities" have been defined as

"[a]ny propensity on the part of the dog, which is likely to cause injury under the circumstances in which the person controlling the dog places it ... and a vicious propensity does not mean only the type of malignancy exhibited by a biting dog, that is, a propensity to attack human beings." 3A CJS *Animals* § 199, at page 701 (1973); *Dansker v. Gelb,* 352 S.W.2d 12, 16–17 (Mo.Sup.1961). It " 'includes as well a natural fierceness or disposition to mischief as might occasionally lead him to attack human beings without provocation.' " (Citation omitted.) *Frazier v. Stone,* [515 S.W.2d 766,] 768 [ (Mo.App.1974) ].

*Farrior v. Payton,* 57 Haw. 620, 562 P.2d 779, 785 (1977). Some courts even allow a jury to reason *a posteriori,* to decide from the nature and result of the attack on a plaintiff, whether an animal had vicious propensities. *Lynch by Lynch v. Nacewicz,* 126 A.D.2d 708, 511 N.Y.S.2d 121, 122 (N.Y.App.Div.1987)(citing cases); *Carlisle v. Cassasa,* 234 A.D. 112, 254 N.Y.S. 221, 226 (N.Y.App.Div.1931)("The very viciousness of the attack upon plaintiff ... clearly demonstrates that the defendant's dog was of a vicious and ferocious disposition...."). This is not the law in South Dakota. *Bauman v. Auch,* 539 N.W.2d 320 (S.D.1995).

██ [¶ 24] If we regard these animals as simply "dogs," then at least until the attack on Crystal, they would not fit within the vicious category. The problem here though is trying to define whether these wolfdogs were domestic or wild. An owner's liability often depends upon the distinction. If an animal is domesticated, the owner must know of its dangerous tendencies to be strictly liable: "But the notice necessary to hold an owner of an animal strictly liable for an attack on a human being is notice that the animal had a propensity to attack human beings, and notice that it had a ferocious disposition toward other animals may not be sufficient." 3 F. Harper et al., *The Law of Torts* § 14.11, at 274 (2d ed 1986)(citing *Re-*

There is no such thing as a "safe" animal to cross with a wolf. The wolf is first and foremost a formidable predator, and if not even thousands of years of domestication have made him thoroughly safe (as evidenced by the many

unsafe dogs we have all known), how can anyone expect to undo in one generation, or several, what nature spent millions of years perfecting.

statement (Second) of Torts, § 509 cmt g (1977)). On the other hand, "It is well known that wild animals born in captivity are untrustworthy and, although seemingly gentle, will on occasion revert to their savage propensities." 3 Harper et al., supra, § 14.11, at 270. Dogs, however, are presumed tame and docile and the burden is on plaintiffs to show otherwise. See Lucas v. Kriska, 168 Ill.App.3d 317, 119 Ill.Dec. 74, 522 N.E.2d 736 (1988); 7 Speiser et al., supra, § 21:46, at 456.

[¶ 25] These wolfdogs were part German Shepherd. Some courts have suggested in dicta that German Shepherds are a vicious breed as a matter of law: "vicious propensities" may be implied from the fact the dog was a German Shepherd, said to have inherited "wild and untamed" tendencies from its "wolf ancestors." Kelley v. Hitzig, 71 Misc.2d 329, 336 N.Y.S.2d 122, 126 (N.Y.Nassau Cty. Ct.1972) (citations omitted); contra Lundy v. California Realty, 170 Cal.App.3d 813, 216 Cal.Rptr. 575, 580 (1985)(viciousness of German Shepherds not an appropriate subject of judicial notice).[18] Here, of course, liability is more attenuated as we are measuring accountability for law enforcement officials who purportedly failed to control the animals or their owner. Even owners are ordinarily not liable for injury caused by a dog unless the owner knows or should have known of the particular dog's vicious tendencies. Restatement (Second) of Torts § 509 (1965); SDCL 40–34–14 (definition of "vicious dog"). See also Arcara v. Whytas, 219 A.D.2d 871, 632 N.Y.S.2d 349 (1995)(summary judgment should have been granted in case of undisputed proof dog had never before bitten anyone and had never growled or bared its teeth when someone approached). An owner of a wild animal, on the other hand, is liable for damage resulting from dangerous propensities characteristic of its class, even when the owner is unaware of any specific vicious tendencies of the particular

animal. Restatement (Second) of Torts § 507 (1977).

[¶ 26] What distinguishes a wild from a domesticated animal when crossbreeding the two occurs? Consider Restatement (Second) of Torts § 506 (1977):

(1) A wild animal ... is an animal that is not by custom devoted to the service of mankind at the time and in the place where it is kept.

(2) A domestic animal ... is an animal that is by custom devoted to the service of mankind at the time and in the place where it is kept.

Traditional or "customary service" signifies domestication of a species, but this may be of little assistance in categorizing a particular crossbreed. 3 Harper et al., supra, § 14.11, at 266. See also SDCL 40–1–1(5):

"Domestic animal," any animal that through long association with man, has been bred to a degree which has resulted in genetic changes affecting the temperament, color, conformation or other attributes of the species to an extent that makes it unique and different from wild individuals of its kind....

Some courts recognize a third category: wild animals capable of domestication. Spring Company v. Edgar, 99 U.S. 645, 25 L.Ed. 487 (1878)(buck deer attacked plaintiff; deer though ferae naturae may be domesticated, and if so owner must have notice animal was vicious); Pate v. Yeager, 552 S.W.2d 513 (Tex.App.1977)(four-year-old's finger bitten after sticking it in pet monkey's cage). Wolves obviously would not fit in this category as they are considered unsafe no matter how "domesticated" their owners may consider them. Hays v. Miller, 150 Ala. 621, 43 So. 818 (1907); Collins v. Otto, 149 Colo. 489, 369 P.2d 564 (1962)(coyote, or "prairie wolf," Canis latrans ). Can wolfdogs be included in the "capable of domestication" category?[19]

---

18. We now know that virtually all domesticated dog breeds are descended from the wolf. However, "[s]ome dogs can be more vicious and dangerous than others. For example, German Shepherds are large, intelligent and strong and, if trained properly, can serve as trusted guard dogs and police dogs. Without proper training, however, German Shepherds can be vicious, indeed...." Nardi v. Gonzalez, 165 Misc.2d 336, 630 N.Y.S.2d 215, 217 (Younkers City Ct.1995)(citing various German Shepherd cases).

19. In some states, wolfdog hybrids are classified as wild animals and private ownership is either prohibited or owners are required to obtain permits to possess them. This now appears to be

Certainly, the owner here thought so. Perhaps all that can be said is that the results of breeding wild with domesticated dogs is unpredictable. This brings us back to the question at hand: How much "actual knowledge" did defendants possess?

■ [¶ 27] Compare actual knowledge in other private duty situations: In *Corridon v. City of Bayonne*, 129 N.J.Super. 393, 324 A.2d 42, 44 (App.Div.1974), an off-duty police officer was required to carry a service revolver. It was well known the officer had frequent bouts of intoxication in public places. "[A] municipality has a plain duty of care in its supervision of those whom it arms." *Id.* In *Campbell v. City of Bellevue*, 85 Wash.2d 1, 530 P.2d 234 (1975), a landowner electrically lit a creek running through his property. The electrical inspector knew the wiring was nonconforming, and a dead raccoon was found in the creek, presumably electrocuted. Knowing this dangerous condition, the inspector failed to disconnect the system as required by ordinance. In both cases the public entity had certain knowledge of a dangerous violation—a frequently drunk police officer who the city required to be armed even while off-duty and a lethal wiring violation of the electrical code which directed immediate disconnection. How can those instances compare with public officials faced with assessing the potential danger of a crossbred pet? Not one person in Tabor ever voiced a public complaint about any danger these animals posed. Even assuming public officers carry more acute awareness of dangerous violations, to imbue them with "must have known" cognizance of potentially dangerous characteristics of crossbred species goes beyond rational expectations. Danger of escape would have been a foremost concern; however, their cage was so secure escape was unlikely, as the officers' inspection verified. As Holmes reflected in *The Common Law*, "[A] law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear." O. Holmes, *The Common Law* 50 (Dover 1991) (1881). Rumors of danger and fears of mixing dog species creates no actual, but constructive knowledge. Constructive knowledge is too remote to sustain a special duty. What we now know about wolfdogs in general, and these animals in particular, was not available to the city and county officials under scrutiny here. Only with the aid of hindsight can one justly say, "they should have known," but that is not enough. We conclude no strong evidence of actual knowledge has been shown.[20]

■ [¶ 28] Let us proceed for a moment with the assumption the Tiptons have sufficient evidence to support the actual knowledge factor. Is proof satisfying this element

the law in South Dakota, at least to the extent a permit is required. In other jurisdictions, these hybrids are apparently regulated as dogs, needing only proper vaccinations and licenses. At least eight states outlaw hybrids and sixteen others restrict ownership or require a permit. *See, e.g.,* Ga.CodeAnn.§ 27–5–5 (Harrison 1990)(requiring license for wild animals); Me.Rev.Stat. Ann. tit 7, § 3921 (West 1996 Supp)(license necessary for dog or wolf hybrid) *and* § 3907 (defining "wolf hybrid" as "any canine, regardless of generation, that has resulted from the interbreeding of a dog and a wolf"); 1997 Supp. Mass.Ann. Laws ch. 131 § 77A (Law Co-op)(bans possession and sale of a "wild canid hybrid" after certain date; subject to wild animal laws); N.H.Rev. Stat.Ann. § 466–A:1 et seq. (Michie 1996 Supp)(bans wolf hybrids after June 6, 1994, unless spayed or neutered; mandates confinement "sufficient to prevent escape"); N.D.Cent.Code § 36–01–08.2 (Michie 1995 Supp)("Any person who keeps a mountain lion, wolf, or wolf hybrid in captivity must obtain an identification number from the [state board of animal health]."); Vt. Stat.Ann. tit. 20 § 3541(8) (Michie 1996 Supp)("Wolf hybrid means an animal which is the progeny or descendant of a domestic dog (Canis familiaris) and a wolf (*Canis lupus* or *Canis rufus* )." ) *and* § 3545 (right to kill pet or wolf hybrid if necessary if it assaults human); Va.CodeAnn. § 3.1–796.93:1(B) (Michie 1994)(defines a "dangerous dog" subject to municipal authority as "canine or canine crossbreed").

20. Courts have had little experience in dealing with the legal aspects of animal hybridization. A "beefalo," for example, is considered by many to be a successful cross between a Bison (buffalo) and any domestic or exotic cattle breed, blending the outstanding qualities of both. Likewise, with wolfdogs, breeders hoped to combine the feral beauty of wolves with the congenial qualities of domesticated dogs. Perhaps owners ought to bear responsibility for experimenting with nature, but it is another thing to hold local governments accountable when a third person's experiment goes awry.

enough to establish a special duty? In *Andrade*, the Minnesota Supreme Court noted, "We might add, too, as to the four *Cracraft* factors, that while they should all be considered, all four need not necessarily be met for a special duty to exist." 391 N.W.2d at 841. Chief Justice Miller restated the same observation in *Tipton I* when writing "any combination" of factors may be sufficient. 538 N.W.2d at 787. It may be conceivable for some other factor by itself to create liability; we need not decide that question today. No matter the proof on actual knowledge, however, alone it is inadequate to establish a private duty. To impose tort liability upon local law enforcement for failure to protect an individual solely upon actual knowledge of imminent danger directly conflicts with the principal rationale behind the public duty rule: it judicially intrudes upon resource allocation decisions belonging to policy makers. For a rudimentary illustration on this point, one need only imagine a variety of simultaneous public emergencies. Only when actual knowledge is coupled with one or more of the other factors, can we uphold both the spirit and substance of the private duty exception. Consider, for example, actual knowledge of a dangerous violation of an enactment protecting a special class, or such knowledge accompanied by reasonable reliance, or local entity conduct aggravating danger. In each of these combinations, the rationale appears to remain intact.

[¶ 29] We are unaware of any "public duty" jurisdiction which pins special duty liability solely upon actual knowledge. Minnesota courts have yet to decide this question. Washington cases link actual knowledge with violation of an enactment protecting a special class. *See Campbell, supra; Livingston,* 751 P.2d at 1200 (although Washington liberally defines special class). *But see, e.g., Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 283 (Ind.1994)(foreseeability not the only consideration under Indiana's private duty

test). As Prosser states, " 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff...." Keeton et al., *supra*, § 53, at 356. No government should carry a burden of protection based purely on foreseeability; or to state it another way, with foreseeability as the sole standard, the public duty rule vanishes. Even if the Tiptons established actual knowledge, this element must be coupled with another of the four factors.[21] We proceed to the remaining factors.

### [¶ 30] 2. Reasonable Reliance

[¶ 31] The Tiptons state they relied upon the defendants "to keep the Town of Tabor safe from dangerous conditions [because people] should be able to visit relatives in a town and not be exposed to dangers such as wolf-hybrids."

> The primary purpose of dog ordinances and statutes is protection of the public from injury or damage ... [D]ogs because of their propensities are, and from time immemorial have been ... peculiarly subject to rigorous police regulation.
>
> Dogs have been viewed as constituting nuisances, at least where they are ferocious or have the habit of jumping and biting at children or other people. Indeed, such a dog is a nuisance of the worst sort.

7 E. McQuillin, *The Law of Municipal Corporations* § 24.284, at 195 (3d ed. 1989). The licensing enactment here was created for the general well being of the community, not for any particular persons or classes. Even if plaintiffs could assume the wolfdogs' presence in Tabor was legally sanctioned through licensing, it would not be adequate to create personal reliance. Dogs bite, licensed or not. For reasonable reliance to occur, the Tiptons must have depended on "specific actions or representations which [caused them] to forgo other alternatives of protecting themselves."

---

**21.** "The *Cracraft* court did not specify how many of the four factors must be proven for a plaintiff to survive a summary judgment motion, nor did the court state the relative importance of the factors. Elucidation of the use made of the four factors would greatly aid trial courts facing summary judgment motions in similar cases.... Although the *Cracraft* court did not specify the

weight to be given each of the four factors, a close reading of *Lorshbough* and *Cracraft* indicates that the single most important factor is that of actual knowledge on the part of the municipality." Note, *Municipal Tort Liability and the Public Duty Rule: A Matter of Statutory Analysis,* 6 WmMitchellLRev 391, 404–05, n95 (1980).

*Andrade,* 391 N.W.2d at 842 (citing *Cracraft,* 279 N.W.2d at 806–07). *See also Lorshbough,* 258 N.W.2d at 99 (noting reliance occurs from "some sort of contact between the governmental unit and the plaintiff which usually induces detrimental reliance by the individual"). Not only is licensing insufficient for reliance, but the fact that law enforcement officials investigated the pens is also an inadequate basis for the type of reliance that creates a special duty. *Cracraft,* 279 N.W.2d at 807 ("[R]eliance on the inspection in general is not sufficient."); *see also Andrade,* 391 N.W.2d at 841 ("The regulatory and licensing presence of the state and its political subdivisions in the affairs of the public is pervasive. If there were blanket liability, it would be a rare lawsuit where some unit of government would not be sued.").

■■■ [¶ 32] Reliance must be based on personal assurances. Instructive of this axiom is *Champagne v. Spokane Humane Society,* 47 Wash.App. 887, 737 P.2d 1279 (1987), where a child was attacked by pit bulldogs. Over a five-month period, people complained about these dogs "running loose and threatening the neighborhood." *Id.,* 737 P.2d at 1283. In response, the Humane Society, regarded as a government agency under the public duty rule, "assured [complainants it] would patrol the area and apprehend any stray dogs." *Id.* at 1284. On the day before the attack, the Society assured the parent of the child later injured that the area would be patrolled. Consequently, a material issue of fact arose over whether the Society breached a private duty after creating reliance upon assurances of protection. *Id.; see Meaney v. Dodd,* 111 Wash.2d 174, 759 P.2d 455 (1988)(overruling earlier cases and holding a governmental duty cannot arise from implied assurances). Similar types of direct assurances have created reasonable reliance. *See, e.g., De Long, supra* (911 caller assured of help coming "right away"). In contrast, no direct promises were given here. Not even townsfolk, much less visitors in Tabor, were assured of any protection from the wolfdogs, except in so much as they were always

penned. Licensing the animals only warranted they had vaccinations and perhaps obliquely assured they would not be allowed to roam free.

> At the heart of most of these "special duty" cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced the injured party either to relax his or her own vigilance or to forego other available avenues of protection.

18 McQuillin, *supra,* § 53.04.50, at 179.

[¶ 33] Nothing in the record suggests that when the Tiptons arrived in town, they knew of the local enactments or practices regarding animal licensure. They arrived only minutes before the attack. No representations were made to them about the safety of the wolfdogs caged in the neighbor's yard. Trusting upon some feeling they would be safe wherever they went in Tabor is perhaps comprehensible; however, it does not rise to the level of reliance causing them to forgo self-precaution.[22] We detect no facts to support reasonable reliance within this record.

[¶ 34] **3. Enactment for Protection of Particular Class**

■■■ [¶ 35] Here we consider as only one factor what once was the entire test in *Hagen.*

> [A] legislative enactment ... whose purpose is found to be exclusively (a) to protect the interests of the state or any subdivision of it as such, or (b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, ... [does not create a standard of conduct to be used to impose tort liability].

*Restatement (Second) of Torts* § 288 (1965). This element "permits recovery against a government entity for negligent failure to enforce its laws only when there is language in a statute or ordinance which shows an intent to protect a particular and circum-

---

**22.** Victims of domestic violence who have obtained protection orders may fit within this category. *See Sorichetti, supra;* Caroll J. Miller, An-

notation, *Governmental Tort Liability for Failure to Provide Police Protection to Specifically Threatened Crime Victim,* 46 A.L.R.4th 948 (1986).

scribed class of persons." *Tipton I*, 538 N.W.2d at 786; *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979)("Duty can be created by statute if the Legislature purposed or intended to protect a class of persons to which the victim belongs against a particular harm which the victim has suffered."). In *Tipton I*, we recognized the illogic of using this factor as a single test, for a class denoted in an ordinance may have been inserted purely by happenstance. *Tipton I*, 538 N.W.2d at 787. *But see Campbell*, 530 P.2d at 241 (allowing a broad definition of special class, including person killed after inspector failed to disconnect blatant electrical safety violation; safety ordinance was for the benefit of special class, persons residing within the ambit of the danger involved); *Halvorson v. Dahl*, 89 Wash.2d 673, 574 P.2d 1190, 1193 (1978)(hotel fire death; declaration of purpose in Seattle Housing Code specified it was "enacted for the benefit of a specifically identified group of persons as well as, and in addition to, the general public"). Although Washington recognizes a broad definition of special class, we follow the *Cracraft* standard, which narrowly includes only "a particular and circumscribed class of persons." *Tipton I*, 538 N.W.2d at 786. *See also Andrade*, 391 N.W.2d at 842 (ordinance enacted wholly for protection of small children in licensed daycare facilities). If we were to adopt Washington's definition—"all persons and property who come within the ambit of the risk"—then we ought candidly to announce the demise of *Tipton I*, as it would control nothing. Notably, the Washington Supreme Court admits that under its

concept of the public duty doctrine, "its myriad exceptions may well reveal that the exceptions have virtually consumed the rule." *Bailey v. Town of Forks*, 108 Wash.2d 262, 737 P.2d 1257, 1260 (1987).

[¶ 36] Does SDCL 7–12–29, which empowers a sheriff to take possession of dangerous animals, create a special duty? [23] This statute delineates no particular class to be protected, nor does it create a mandatory obligation. The general nuisance law, SDCL 21–10–1, another statute the Tiptons raise, creates no special class or a mandatory duty, either.[24] SDCL 21–10–3 names no "particular and circumscribed class," but general classes, and only for the purpose of defining the difference between public and private nuisances. Tabor's vicious dog ordinance mentions no particular class. We believe the generality of these enactments is determinative. Simply because certain laws give Tabor and Bon Homme authority to act does not mean that a special class is created and needs to be protected. These enactments have no particular applicability to children, visitors to town, or anyone in particular. The record fails to support this element.

### [¶ 37] 4. Failure To Avoid Increasing Risk of Harm

[¶ 38] Under this factor official action must either cause harm itself or expose plaintiffs to new or greater risks, leaving them in a worse position than they were before official action. Could Tabor have aggravated the risk of harm by licensing the hybrids?[25] Failure to diminish harm is not

23. SDCL 7–12–29 provides:

> The sheriff may take possession of any animal suspected of being dangerous. The sheriff may hold such animal until a formal determination can be made of the extent of the danger such animal poses. If the animal has attacked or bitten a human or an animal pet, the formal determination shall include consultation with the department of health for the purposes of rabies control. The sheriff may dispose of any animal so determined to be dangerous.

*See also* SDCL 40–36–1:

> The department of game, fish and parks shall cooperate and enter into cooperative agreements with the United States fish and wildlife service or any other agency in the control and disposition of coyotes, feral dogs, fox, prairie dogs, and other wild animals in this state that

are injurious to livestock, poultry, game, land and the public health.

24. There are, as the dissent points out, a host of outdated nuisance decisions holding government entities liable to private individuals for failure to abate nuisances. All these cases pre-date the emergence of the public duty rule and are thus inapplicable.

25. *See Ryan v. State, Dep't of Transp.*, 420 A.2d 841 (R.I.1980)(licensing driver who had multiple violations created no liability to individuals later injured; applying public duty rule); *but see Oleszczuk v. State*, 124 Ariz. 373, 604 P.2d 637 (1979)(imposing liability on state for negligently issuing driver's license to unsafe epileptic driver as statute was designed to protect a particular class: highway users).

enough. *Andrade*, 391 N.W.2d at 843 (county's negligent licensing, inspecting and supervising day care home sufficient to create liability under third factor, ordinance for a special class (children), but it did not satisfy fourth factor). Though wolves are federally protected, no South Dakota law specifically prohibits keeping them, much less wolf hybrids: private ownership of wild animals is statutorily sanctioned. SDCL 43–2–3: "Animals, wild by nature, are the subjects of ownership when tamed or taken and held in possession, or disabled and immediately pursued." *But see* SDCL 40–3–26 (regulations and permits for captive nondomestic mammals); ARSD § 12:68:18:03 (last amendment effective December 31, 1993)(permit required to possess any nondomestic mammal or any of its hybrids of the family *Canidae* ). The risk after licensing the animals was no greater than the risk before they were licensed. The Hollands kept the dogs in town two years before they were licensed and at the time of the attack on Crystal, the licenses had expired. Nor can inspection of the pen by law enforcement officials support this element. *See Cracraft*, 279 N.W.2d at 808 ("[W]e refuse to impose a duty of care merely because an inspection is undertaken, for it would create a new tort.").

[¶ 39] Neither licensing the wolfdogs nor inspecting their pens were affirmative acts increasing the risk of harm to those approaching the hybrids. *See Von Batsch, supra,* in which investigating officers failed to find evidence of intruders, and, after the police left, the intruders killed a businessperson. "The officers did not create the peril to decedent. They took no affirmative action which contributed to, increased, or changed the risk which would have otherwise existed. At most they merely failed to eliminate the danger of unknown intruders." 222 Cal. Rptr. at 246–47. *See also Lopez v. City of San Diego,* 190 Cal.App.3d 678, 235 Cal.Rptr. 583, 585 (1987)(McDonald's restaurant massacre: "The police can in no way be charged with lulling [the killer's] victims into a false sense of security, nor can the alleged inaction by police reasonably be said to have increased the risk of harm to which the victims were subject.").

[¶ 40] In *Sampson v. City of Lynn,* 405 Mass. 29, 537 N.E.2d 588 (1989), the chief of police issued a pistol permit to a so-called "disreputable person," who was "unfit," "improper," and "not competent" to carry a gun. *Id.*, 537 N.E.2d at 588. The permittee later shot and killed someone. In finding no special duty, the court wrote:

> The plaintiff has not pointed us to any statutes or ordinances which establish that the city owed the decedent, as a member of an identifiable subclass, a special duty of care.... The [permit] statute does not evince a legislative intent to protect a particular group of individuals. Rather, the beneficiaries of the statute are members of the general public.′...
>
> The plaintiff has not alleged any foreseeable risks, the knowledge of which would have enabled the city to prevent the harm which ultimately occurred.... The allegations in this case do not support a claim that the city's purported negligence created a risk of immediate and foreseeable injury.

*Id.* at 589 (citations omitted). Failure to diminish potential harm is insufficient. Defendants cannot bear liability under this element.

[¶ 41] In summary, we conclude as a matter of law no private duty liability exists here, as none of the four *Cracraft* elements have been met.

[¶ 42] Affirmed.

[¶ 43] MILLER, C.J., and AMUNDSON and GILBERTSON, JJ., concur.

[¶ 44] SABERS, J., dissents.

SABERS, Justice (dissenting).

[¶ 45] Genuine issues of material fact regarding the exceptions to the public duty doctrine permeate this case and the trial court should have allowed it to go to a jury. "The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *State, Dep't of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D. 1989) (citation omitted). Since the defendants did not meet their burden, summary

judgment was improperly granted and we should reverse.

**[¶ 46] 1. THERE ARE GENUINE ISSUES OF MATERIAL FACT WHETHER DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE POTENTIAL FOR AN ATTACK BY THE WOLVES.**

[¶ 47] Tabor Police Chief Sutera and Bon Homme County Sheriff O'Donnell both visited the Holland residence and personally observed the wolves and their cage. The animals' genetic makeup may include a small percentage of German Shepherd, but by all accounts their appearance[26] and behavior were undeniably characteristic of wolves, not dogs.[27] Additionally, the Town employee responsible for the licensing the wolves classified them as "wolf hybrids" based solely upon information provided by Mrs. Holland; however, the veterinarian's rabies certificate upon which the employee relied clearly identified the animals as "wolves."

[¶ 48] As noted by the conference opinion, the pen in which the wolves were kept "suggested contact with the creatures it held may be dangerous." *Supra* ¶ 19.

Furthermore, the owner's treatment of the wolf dogs could be interpreted as proof that they were dangerous, wild animals. Evidence showed that Holland *never* released the animals from their pens. He also took extraordinary precautions to prevent their escape. In constructing the animals' pen, Holland used fence which was seven to eight feet tall, with an additional three feet of wire all the way around the pen. He installed wire under the surface of the ground, approximately four feet into the pen, so that the animals could not dig an escape hole along the edge of the pen. He also asked neighbors to refrain from visiting the pen unless he was present. In addition to having no yard fence, there was no exterior guard rail or secondary fence surrounding the cage that prevented visitors from coming into physical contact with the animals.

*Tipton v. Town of Tabor,* 538 N.W.2d 783, 787 (S.D.1995) (*Tipton I* ) (emphasis in original).

[¶ 49] The manner in which Holland caged his animals was observed by Sutera and O'Donnell. While escape may have been unlikely, the wolves were able to stick their heads through openings in the livestock panels,[28] which ultimately facilitated this attack. It is for the jury, not the trial court or this court, to decide whether an attack could be anticipated based upon the defendants' observations of the cage and whether that constitutes actual knowledge of the potential

26. Copies of photographs of the animals are attached to this writing.

27. When this court reversed and remanded this case, we stated, "The suggestion by Town that a four to five percent mix of German Shepherd would have diminished the animals' innate dangerous propensity is a claim that must be examined more fully on remand." *Tipton v. Town of Tabor,* 538 N.W.2d 783, 787 (S.D.1995) (*Tipton I* ). On remand, the defendants offered no proof to support this contention. The trial court stated, in granting summary judgment to the defendants, "[W]hile it is true ... that Defendants have not produced anything in answer to the Supreme Court's query, neither have Plaintiffs furnished any argument, factual or legal, which would make this inquiry relevant." The burden is on the party requesting summary judgment to demonstrate the absence of any genuine issue of material fact and that he is entitled to judgment on the merits as a matter of law. *Walz v. Fireman's Fund Ins. Co.,* 1996 SD 135, ¶ 6, 556 N.W.2d 68, 70. For the trial court to shift the burden to the Tiptons was unfair and contrary to our well-established standards for summary judgment.

Even so, the Tiptons produced information from various publications concerning the dangers of wolf hybrids. Compounding the trial court's error is the majority's statement that there is no showing that any of the defendants were ever aware of this information. Again, the burden is on the defendants; they argued the wolves were less dangerous because of their 4–5% German Shepherd ancestry. Tiptons refuted their argument. Therefore, it is a disputed issue of material fact whether the defendants knew that hybrids "make horrible pets" and are "schizophrenic—sometimes Lassie, sometimes Cujo. Getting too close to one is a gamble. This animal is going to make the pit bull seem like a puppy." (*Supra* note 17).

28. In fact, photographs in the record show one wolf with its entire head outside the cage. Two sides of the cage were livestock panels, which are fences consisting of continuous rectangular openings of substantial size.

danger. *See, e.g., Barger v. Jimerson,* 130 Colo. 459, 276 P.2d 744, 746 (1954) ("[T]he proof offered as to the nature and disposition of the dog as appearing to be savage and ferocious was equivalent to express notice. Moreover, the fact that defendants kept the dog confined is persuasive in concluding that they considered it unsafe for the dog to be at large."); *Machacado v. City of New York,* 80 Misc.2d 889, 365 N.Y.S.2d 974, 979 (N.Y.Sup. Ct.1975) ("Danger and physical harm are not of necessity screened out by the presence of a barrier if that barrier is in some way surmountable or permits the threat of danger."); *cf. Uccello v. Laudenslayer,* 44 Cal. App.3d 504, 118 Cal.Rptr. 741 (1975) (listing reasons landlord should have known of dog's dangerous propensities and including "Beware of Dog" signs).

[¶ 50] The conference opinion states that "Holland had previous experience in raising wolfdogs and represented them to be safe." *Supra* ¶ 19. It is unclear to whom he made such representations. He told the neighbors never to approach the cage unless he was present. Even if he told Sutera and O'Donnell that the wolves were safe, it is essentially irrelevant. An owner of a dangerous animal can not be expected to be objective about its dangerousness. "Wolves ... are considered unsafe no matter how 'domesticated' their owners may consider them." *Supra* ¶ 26 (citing *Hays v. Miller,* 150 Ala. 621, 43 So. 818 (1907)). If an owner were objective, there would be no need for ordinances and statutes such as the ones at issue here. *See* SDCL 7-12-29:

> The sheriff may take possession of any animal suspected of being dangerous. The sheriff may hold such animal until a formal determination can be made of the extent of the danger such animal poses. If the animal has attacked or bitten a human or an animal pet, the formal determination shall include consultation with the department of health for the purposes of rabies control. The sheriff may dispose of any animal so determined to be dangerous.

*See also* Town of Tabor Ordinance § 8–1108, which provides: "No dog of fierce, dangerous or vicious propensities, licensed or not, shall be harbored or kept within the town." As noted in *Champagne v. Spokane Humane Society,* 47 Wash.App. 887, 737 P.2d 1279, 1282 (1987), "The protection of the public against marauding animals, whether wild or domestic, is similar in nature to the protection furnished by a police department against the lawless and depraved elements among men." (Citation omitted).

[¶ 51] As for the ordinance which became effective the day after the attack on Crystal Tipton, reproduced *supra* at note 15, even the conference opinion acknowledges that "there is contradictory evidence" as to whether it was enacted in response to Holland's wolves. Obviously, if it were enacted for that reason, it constitutes strong evidence that the Town of Tabor had actual knowledge of the likelihood of an attack by the wolves. "Contradictory evidence" on a material factual issue precludes summary judgment.[29] Sorting out the truth is the jury's function. *Bauman v. Auch,* 539 N.W.2d 320, 325 (S.D. 1995).

> It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among con-

---

**29.** The trial court misread *Tipton I;* in granting summary judgment, the court stated, "The Supreme Court obviously did not *find* issues of material facts. If they had done so, they would not have *remanded* for further review." (Emphasis in original). The plain language of our opinion indicates there were unresolved questions of fact: "[W]hether Town or County had actual knowledge of a dangerous condition created by the presence of the wolf hybrids is a subject of *sharp dispute." Tipton I,* 538 N.W.2d at 787 (emphasis added). We pointed out that many more facts could be considered under the *Cra-*

craft factors than were addressed under the *Hagen* test, including the significance, if any, of the defendants' observations of the extraordinary measures taken by Holland in caging the wolves. *See also id.* at 788 (Erickson, Circuit Judge, concurring in part and dissenting in part) ("[T]he majority argues that there is a material issue as to these public officials' actual knowledge of a dangerous condition[.]"). For the trial court to assume we would reverse and remand a grant of summary judgment where there were no genuine issues of material fact is somewhat illogical.

flicting inferences and conclusions that which it considers most reasonable.

*Fajardo v. Cammack*, 322 N.W.2d 873, 878 (S.D.1982) (Wollman, C.J., concurring specially) (citations omitted).

### [¶ 52] 2. REASONABLE RELIANCE.

[¶ 53] Although there is no evidence of any direct representation to Crystal Tipton, one could argue that she and other similarly situated children should be able to reasonably rely, without evidence, on government authorities to maintain towns free from attractive, public nuisances which viciously attack unsuspecting children. As noted, this attack occurred within the community of the Town of Tabor, not in a rural or secluded area.

[¶ 54] At any rate, a plaintiff's inability to prove reliance is not a bar to suit. *Andrade v. Ellefson*, 391 N.W.2d 836, 843 (Minn.1986) (finding a special duty when first factor only partially met and third factor conclusively established); *Tipton I*, 538 N.W.2d at 787 ("Strong evidence concerning any combination of these factors may be sufficient to impose liability on a government entity.").

### [¶ 55] 3. THERE ARE GENUINE ISSUES OF MATERIAL FACT WHETHER CRYSTAL TIPTON WAS A MEMBER OF THE CLASS PROTECTED BY THE STATUTES.

[¶ 56] The plain language in *Tipton I* instructs that the language of a statute is not dispositive of whether there is a duty to any particular class of persons:

> Sole reliance on statutory language in determining whether a duty exists is needlessly restrictive and arbitrary. A statutory reference to a particular class of persons could very well be inadvertent rather than the result of any reasoned analysis of municipal or county responsibility. We require an analytical framework that more accurately measures a public entity's culpability for the harm suffered.

538 N.W.2d at 787. Despite this language, the conference opinion concludes that, since the statutes and ordinances at issue do not mention a particular class, they were not intended to protect Crystal Tipton. It is not disputed that SDCL 7–12–29 and Tabor's ordinance § 8–1108 gave the Town and the County the authority to act.

[¶ 57] Sutera and O'Donnell were satisfied after their visit to the cage that the animals could not escape. Therefore, the only persons who could foreseeably be injured by the wolves were those persons who did not comprehend the danger of approaching the cage. Compare *Machacado*, 365 N.Y.S.2d at 976, where the court noted, "Experience and common sense dictate that a person, believing herself to be in imminent danger of attack by a feral animal, will take immediate and precipitous action to avoid injury." Children are not and can not be held to that level of experience and common sense:

> Generally, a minor is not held to the same standard of conduct as that of an adult unless he engages in an activity normally only undertaken by adults. *Wittmeier v. Post*, 78 S.D. 520, 105 N.W.2d 65 (1960). The objective standard of the reasonable prudent person does not apply to a minor, but rather a special (subjective) standard of care is used which takes into account his age, intelligence, experience and capacity. *Finch v. Christensen*, 84 S.D. 420, 172 N.W.2d 571 (1969).

*Alley v. Siepman*, 87 S.D. 670, 674, 214 N.W.2d 7, 10 (1974); *cf. Hofer v. Meyer*, 295 N.W.2d 333, 336 (S.D.1980) (attractive nuisance case) ("A child of three, indeed even older children, would not perceive the horse as being imminently dangerous.").

[¶ 58] Additionally, the Tiptons raise SDCL 21–10–1, which defines what acts and omissions constitute nuisances:

> A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:
>
> (1) Annoys, injures, or endangers the comfort, repose, health, or safety of others;
>
> . . .
>
> (4) In any way renders other persons insecure in life, or in the use of property.

As noted by the conference opinion, *supra* ¶ 31, ferocious or biting dogs are "a nuisance of the worst sort."

[¶ 59] The Town of Tabor had the power to remove the wolves under this statute. *See* SDCL 9–29–13: "Every municipality shall have power to declare what shall constitute a nuisance and prevent, abate, and remove the same." *See also Wynkoop v. Mayor & City Council of Hagerstown*, 159 Md. 194, 150 A. 447, 449 (1930) ("[W]here the municipality is authorized by the Legislature to abate nuisances, the authority carries with it the duty to exercise it, and where it either fails to adopt such ordinances as may be necessary to the reasonable performance of that duty, or to exercise reasonable diligence in enforcing them when adopted, it will be answerable to any private individual injured as a result of its default.").

[¶ 60] A nuisance such as Holland's wolves constitutes a "public" nuisance. *See* SDCL 21–10–3:

A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal. Every other nuisance is private.

*Cf.* SDCL 40–34–4 (failure to keep one's dogs confined is public nuisance when more than five dogs involved). The significance of the wolves constituting a public nuisance is that the statute narrows the class of persons intended to be protected by its provisions. If it were meant to extend a duty of protection to the public as a whole, it would not make sense to list the three categories of persons to whom it is directed. "[T]his court must assume that the Legislature meant what the statute says and therefore give its words and phrases a plain meaning and effect." *In re Estate of Gossman*, 1996 SD 124, ¶ 6, 555 N.W.2d 102, 104 (citing *Nilson v. Clay County*, 534 N.W.2d 598, 601 (S.D.1995)). SDCL 2–14–1 provides that when construing and giving effect to our statutes, "words used are to be understood in their ordinary sense...." As the plain language of SDCL 21–10–3 states, the persons to be protected are a "community," a "neighborhood," or "any considerable number of persons."

[¶ 61] Clearly, the duty to declare something a nuisance and to then remove it is owed, not to the public generally but rather to neighbors and adjoining landowners.[30] Surely a child visiting a neighbor or adjoining landowner is included in the class of persons intended to be protected by the nuisance statutes.[31] It is undisputed that defendants had the power to remove the animals. Nuisance liability may be imposed on nonowners if they have control over "the instrumentality alleged to constitute the nuisance." 58 AmJur2d *Nuisances* § 117, at 761 (1989). "The person whose duty it is to abate a nuisance should answer for the consequences resulting from its continuance." *Id.* § 118; *cf. Cochrane v. Mayor of City of Frostburgh*, 81 Md. 54, 31 A. 703, 705 (1895) (holding city liable for failure to control animals running at large, and stating that when a statute confers a power upon a corporation to be exercised for the public good, "the exercise of the power is not merely discretionary, but imperative, and the words 'power and authority' in such case may be construed 'duty and obligation'").

---

**30.** *See, e.g., City of Aberdeen v. Wellman*, 352 N.W.2d 204, 205 (S.D.1984) (noting that one of the considerations in determining whether a nuisance must be abated is "the present use and trends of use of *surrounding property*") (emphasis added) (citation omitted); *see also Union County v. Hoffman*, 512 N.W.2d 168, 170 (S.D. 1994) (analyzing whether mobile home park was a public nuisance by examining its effect on residents of the park); *Town of Winfred v. Scholl*, 477 N.W.2d 262, 263 (S.D.1991) (affirming trial court's conclusion that junk on appellant's property constituted a nuisance and noting that the conclusion was reached by taking testimony from adjoining landowners); *Watson v. Great Lakes Pipeline Co.*, 85 S.D. 310, 314–15, 182 N.W.2d 314, 316–17 (1970) (testing of neighboring landowners' wells sufficient to establish jury question whether defendant polluted their water and thus constituted public nuisance).

**31.** See *Runkel v. City of New York*, 282 A.D. 173, 123 N.Y.S.2d 485, 489 (1953), where the City of New York was held liable for failing to abate a known nuisance when neighborhood children were injured while playing in a dangerous, abandoned building. The children were found to come within the class of persons intended to be protected by the nuisance statutes. The court relied on N.Y. Mult. Dwell. Law § 309, which defines "nuisance" in part as any public nuisance known at common law and "whatever is dangerous to human life or detrimental to health."

[¶ 62] As noted, the Town employee who licensed the wolves had actual knowledge that they were wolves. She testified by deposition that she relayed this information to the Town Board. The ordinance granting the Town the power to license dogs did not include the power to license wild animals. "A municipality or other political subdivision licensing or authorizing the creation or maintenance of a nuisance is liable for resulting damages[.]" 57 AmJur2d *Municipal, County, School, & State Tort Liability* § 165, at 177 (1988).[32]

[¶ 63] Children in the neighborhood certainly came within the "ambit of the risk" created by any negligent failure to act on the potential danger of an attack by the wolves. *See Livingston v. City of Everett,* 50 Wash. App. 655, 751 P.2d 1199, 1201 (1988) (citations omitted):

> When statutes intend to insure the safety of the public highways, a governmental officer's knowledge of an actual violation creates a duty of care to *all persons and property who come within the ambit of the risk created by the officer's negligent conduct.*

(Emphasis added) (finding that persons entering an apartment where dangerous dogs were released to owner by City Animal Control came within "ambit of the risk" created by release of the dogs). It was only a matter of time before a child wandering into the unfenced yard and near the cage would be attacked by the wolves.[33] Whether the defendants should have acted to protect Crystal Tipton and other children in the neighborhood is a question for the jury.

[¶ 64] There are genuine issues of material fact whether Crystal and similarly situated children should have been the object of the defendants' duty to act on the potential danger of an attack by these wolves. As noted, Crystal may have been a reasonably foreseeable plaintiff in light of the knowledge the defendants possessed after visiting the cage. *See Champagne,* 737 P.2d at 1283 (noting that under these exceptions, "an entity performing governmental functions may be held liable where the plaintiff demonstrates that an otherwise general duty to the public has focused on the particular plaintiff and the entity breaches that duty"). Furthermore, the nuisance statutes clearly delineate a duty, not to the general public but to three classes of persons.

[¶ 65] The conference opinion, *supra* note 16, states that the jury can consider the defendants' resources and its resource allocation policy in answering the question whether the defendants owed a duty to Crystal and other similarly situated children. However, this is really a non-issue under the nuisance statutes because the defendants had the opportunity to remove these wolves at *no cost* to the municipality. *See* SDCL 21–10–6, which provides, in relevant part:

---

32. *See, e.g., Landau v. City of New York,* 180 N.Y. 48, 72 N.E. 631, 634 (1904) (city could be held liable for consenting in advance to nuisance (fireworks); issuing permit placed it under same liability as if it created nuisance itself); *Speir v. City of Brooklyn,* 139 N.Y. 6, 34 N.E. 727, 728 (1893) (city issuing fireworks permit held liable for resulting fire); *Kolb v. Mayor of Knoxville,* 111 Tenn. 311, 76 S.W. 823, 824 (1903) (city liable for illness resulting from pollution—it did not create pollution, but it licensed individual who did); *City of Richmond v. Smith,* 101 Va. 161, 43 S.E. 345, 348 (1903) (noting that since it was city's duty to abate nuisance, "[T]he sin of commission in granting the permit cannot be less than the sin of omission in failing to discharge its duty"); *see generally* Annotation, *Liability of Municipality for Injury of Damage From Explosion or Burning of Substance Stored by Third Person Under Municipal Permit,* 17 A.L.R.2d 683 (1951).

33. *See Muhlenkort v. Union County Land Trust,* 530 N.W.2d 658, 662 (S.D.1995) ("To establish a duty on the part of the defendant, it must be foreseeable that a party would be injured by the defendant's failure to discharge that duty."); *Mark, Inc. v. Maguire Ins. Agency, Inc.,* 518 N.W.2d 227, 229–30 (S.D.1994) ("Whether a duty exists depends on the foreseeability of injury."); *see also Mid–Western Elec., Inc. v. DeWild Grant Reckert & Assocs. Co.,* 500 N.W.2d 250, 254 (S.D.1993) ("We instruct trial courts to use the legal concept of foreseeability to determine whether a duty exists."); *Champagne,* 737 P.2d at 1283 (noting that the "privity" necessary to impose liability despite the public duty doctrine refers to the relationship between the entity and the reasonably foreseeable plaintiff); *Wytupeck v. City of Camden,* 25 N.J. 450, 136 A.2d 887, 894 (1957) (holding city responsible for injuries to minor and noting that the relationship between the parties is founded upon the foreseeability of harm to the person in fact injured) (paraphrasing Judge Cardozo's writing in *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928)).

A public nuisance may be abated without civil action by any public body or officer authorized thereto by law.... Every municipality may defray the cost of abating a public nuisance by taxing the cost thereof by special assessment against the real property on which the nuisance occurred. When the nuisance abated is an unsafe or dilapidated building, junk, trash, debris or similar nuisance arising from the condition of the property, the municipality may commence a civil action against the owner of the real property for its costs of abatement in lieu of taxing the cost by special assessment.

The public duty rule stems, at least in part, from a concern that individuals could affect the manner in which limited public resources are utilized. *See supra* ¶ 10. As this statute makes clear, the defendants are afforded an opportunity to carry out their duty without depleting *any* resources. Therefore, this concern is not present in a suit brought under the nuisance statutes, and *should be considered* by the jury—as stated by the majority—*not withheld* from the jury as done by the trial court.

## [¶ 66] 4. THERE ARE GENUINE ISSUES OF MATERIAL ACT WHETHER DEFENDANTS' FAILURE TO ACT CONSTITUTED A BREACH OF DUTY.

[¶ 67] As noted, the Defendants had the authority to remove the wolves from the residence. They were apparently under no duty to visit Holland's home on the basis of complaints concerning the howling.[34] However, as stated by the conference opinion, *supra* ¶ 13, "persons are generally not liable for failure to act, *but once having acted, [they] must proceed without negligence.*" (Emphasis added). If the jury finds that the defendants possessed actual knowledge of the likelihood of an attack by the wolves, whether they were *obligated* to act is another question for the jury. *See Andrade,* 391 N.W.2d at 841 ("Actual knowledge of a dangerous condition tends to impose a special duty to do something about that condition."); *see also id.* at 844 (Wahl, Justice, concurring specially) ("[Defendants] had actual knowledge of a dangerous condition ... such that a special duty was imposed on them to do something about the condition."). Whether a defendant breached a duty and whether his breach resulted in injury to the plaintiff are questions for the jury. *Laber v. Koch,* 383 N.W.2d 490, 493 (S.D.1986).[35]

[¶ 68] Whether the removal of the wolves would have diminished the risk of harm to Crystal and other children is yet another jury question. The conference opinion states that "[f]ailure to diminish harm is not enough." *Supra* ¶ 38 (citing *Andrade,* 391 N.W.2d at 843). It is true that *Andrade* stands for the proposition that failure to *decrease* the risk of harm can not be the grounds upon which duty is *imposed.* However, *Andrade* goes on to state that failure to decrease the risk of harm "goes to whether, assuming the legal duty exists, it was *breached.*" 391 N.W.2d at 843 (emphasis added). As *Andrade* states, the duty can be estab-

---

34. Regardless, once they undertook to visit the wolves' cage, they may have assumed a duty to Crystal Tipton. See, for example, *Schultz v. Mills Mutual Insurance Group,* 474 N.W.2d 522, 524 & n. 1 (S.D.1991), where this court noted that a cause of action may be premised upon Restatement (Second) of Torts § 324A (1965), which provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
  (a) his failure to exercise reasonable care increases the risk of such harm, or
  (b) he has undertaken to perform a duty owed by the other to the third person, or
  (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

35. Ordinarily, the question of whether a duty exists is a question of law for the court. Here, the answer to that question rests upon substantial issues of material fact that are rightfully jury questions. *Swiden Appliance & Furniture, Inc. v. National Bank of SD,* 357 N.W.2d 271, 277 (S.D. 1984); *accord City of Gary v. Odie,* 638 N.E.2d 1326, 1329–30 (Ind.Ct.App.1994) ("Factual questions may be interwoven with the determination of the existence of a relationship, rendering the existence of a duty a mixed question of law and fact, ultimately to be resolved by the fact-finder.") (citation omitted).

lished by the knowledge of the dangerous condition. It is axiomatic that questions of breach, proximate cause, and damages are resolved by the jury in all but the rarest of cases.

[¶ 69] Imposing liability for a person's failure to act when that person has knowledge of the dangerousness of an animal, coupled with the power to remove the animal from the premises is not a novel concept. Analogous are the cases where liability was imposed when a landlord's knowledge of the dangerous propensity of a tenant's dog was combined with his power to prevent the animal's presence on the premises:

> [I]f a landlord has such a degree of control over the premises that it fairly may be concluded that he can obviate the presence of the dangerous animal and he has knowledge thereof, an enlightened public policy requires the imposition of a duty of ordinary care. To permit a landlord in such a situation to sit idly by in the face of the known danger to others must be deemed to be socially and legally unacceptable.
>
> . . . .
>
> There is a moral blame attached to a landlord's conduct under these circumstances; he·cannot be permitted to knowingly stand aside where it is shown that he has the power to remove the animal from the premises without incurring a liability for his failure to act.

*Uccello,* 118 Cal.Rptr. at 746, 747–48; *accord Donchin v. Guerrero,* 34 Cal.App.4th 1832, 41 Cal.Rptr.2d 192 (1995); *Linebaugh v. Hyndman,* 213 N.J.Super. 117, 516 A.2d 638 (App. Div.1986).

[¶ 70] The essence of Tipton's claim is that an attack should have been reasonably anticipated by the defendants, that it became their duty to protect Crystal against it, and that their failure to perform that duty was negligence. There is "strong evidence" on three of the four factors, which is more than *Tipton I,* 538 N.W.2d at 787 or *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801 (Minn. 1979), require. Since resolution of this action hinges on the jury's determination of sharply disputed issues, i.e., whether the defendants had actual knowledge of the likelihood of an attack, and if so, whether they breached a duty by not acting, summary judgment was improper. We should reverse and remand for trial on the merits.