OPINION OF THE COURT
Albert A. Alteri, J.
Defendant is charged with possession of a wolf hybrid in violation of section 180.1 of the miscellaneous regulations of the Department of Environmental Conservation (DEC) of the State of New York (6 NYCRR), a violation. The regulation reads in part:
“§ 180.1 Wildlife dangerous to health or welfare * * *
“(b) Prohibitions. No person may possess, release, transport, import or export, or cause to be released, transported, imported or exported, except under permit from the department, any of the following live wildlife: all subspecies of the lion (Panthera leo), the raccoon dog (Nyctereutes procyonides), and any animal, the overall appearance of which makes it difficult or impossible to distinguish it from a wolf (Canis lupus) or a coyote (Canis latrans).”
The first issue to be resolved is whether the defendant can be prosecuted under that regulation.
Section 180.1 (b) of the miscellaneous regulations prohibits possession of any of the following live wildlife: “any animal, the overall appearance of which makes it difficult or impossible to distinguish it from a wolf (Canis lupus)” (emphasis supplied). Thus, in order for this defendant to be found guilty of a violation of that section the People must have proved that she: (1) possessed; (2) species of a live wildlife; (3) specifically, an animal the over-all appearance of which makes it difficult or impossible to distinguish it from a wolf.
Wildlife is described as “wild game” and all other animal life “existing in a wild state”. (ECL 11-0103 [6] [a] [emphasis supplied].) Wild game is all game (game birds, big game, small game) except domestic game birds or domestic game animals. (ECL 11-0103 [3].)
The words “existing in a wild state” need no explanation other than their ordinary meaning of game “living under unrestrained conditions”.
Therefore, although certain wolf hybrids may be prohibited from possession certain others cannot. For instance, a wolf *267 hybrid kept as a pet that was born in captivity and domesticated from birth, as was the animal here, cannot be said to be “existing in a wild state” and, consequently, cannot be considered wildlife, whereas a possessed animal that had been taken from the wild can be said to be still “existing in a wild state” and considered wildlife.
Although the intent of 6 NYCRR 180.1 was to protect humans and animals alike it has fallen short of its goal and neither ECL 71-0919, 71-0921 nor 71-0923 establishing such offenses as either misdemeanors or violations, and setting their punishment, can remedy the problem. Section 180.1 was primarily enacted to supplement and enforce ECL articles 11 and 13; still, that was not accomplished until ECL 11-0511 was amended to include “wolfdog” as one of the protected wildlife. However, the defendant was not charged with a violation of ECL 11-0511 and cannot be prosecuted under that section. A criminal complaint must state the exact section under which a defendant is charged and neither the court nor the defendant is required to grope for sections not charged. (See, CPL 100.10, 100.15.)
Therefore, defendant cannot be found guilty of violating section 180.1 of the miscellaneous regulations of the Department of Environmental Conservation of the State of New York and the complaint against her must be dismissed.
The next issue to be resolved is whether the wolf hybrid was legally taken from the defendant and whether the animal should be returned to her in view of the complaint against her being dismissed.
This is a case of first impression; hence, a review of the legislative history of the regulation is appropriate. In interpreting a statute, the intent of the Legislature is the controlling or most important factor. (See, 97 NY Jur 2d, Statutes, § 101; Matter of Abrams v Ford Motor Co., 74 NY2d 495 [1989]; Matter of Jessup, 85 Misc 2d 575 [1975]; People v Lane-Marvey Corp., 203 Misc 413 [1952].) Court interpretations of legislation are subordinate to legislative intent and not subject to speculation. (Matter of Roballo v Smith, 99 AD2d 5 [4th Dept 1984].) Nonetheless, the statutory language must be clear and unambiguous. (Doctors Council v New York City Employees’ Retirement Sys., 71 NY2d 669.)
Wolves (Canis lupus) were sought as companion animals by persons desiring an unusual or exotic pet. However, wolves were, and are, unavailable in New York State having been listed as an endangered species, and illegal to possess except for scientific or educational purposes or for display in zoos.
*268 To circumvent the prohibition against keeping wolves as pets enterprising people commenced selling and keeping wolf/ dog hybrids. Because a dog is defined under the Agriculture and Markets Law as a member of the species “Canis Familiaris” the DEC law did not cover hybrids of dogs with wolves and there was no requirement that they be licensed. Consequently, an increased number of hybrids were being possessed and without the minimum safeguards required of the public for the common domestic dog.
In an attempt to eliminate that problem the Legislature authorized the DEC to promulgate new regulations designating the specific species to be regulated, resulting in the enactment of the miscellaneous regulations of the Department of Environmental Conservation, also known as 6 NYCRR 180.1.
The new 6 NYCRR 180.1 dealt with prohibiting the importation of certain game and actually lists the wildlife that DEC considers dangerous to the health or welfare of the people of the State of New York and protection to the animals themselves. It restricts their possession to legitimate scientific, educational or exhibitory purposes with the intent of helping to prevent personal injuries from wolves and other large canids to those who keep these dangerous animals and to third parties accidentally exposed to them, by requiring a permit issued by DEC. Concurrently, it required humane treatment of the captive animals.
There were no other rules under the Environmental Conservation Law that governed wolf hybrids. The intended purpose of the new regulation was to address that issue. Sections 120 and 370 of the Agriculture and Markets Law dealt with dogs and dangerous wild animals in general and were not in conflict with this new regulation.
As stated in the regulation, the purpose of the rule was to list species of wildlife, not otherwise identified in the Environmental Conservation Law, or in 6 NYCRR, that presented a danger to the health or welfare of the people of the State, individual residents or indigenous wildlife populations.
Lacking enactment, owners of these animals, as well as third parties, would have continued to be harmed as the pets grew larger and increasingly dangerous. As a rule, wolf hybrids made poor pets once they were fully grown.
Section 180.1 of the miscellaneous regulations was repealed in 1966. The new section 180.1 was filed June 14, 1972. Two subsequent amendments to that regulation did not alter the *269 fact that the language contained therein was unclear, vague and ambiguous. Wolf hybrids were not mentioned in the new regulation nor in any of the two subsequent amendments and its attempted definition of “any animal, the overall appearance of which makes it difficult or impossible to distinguish it from a wolf’ (6 NYCRR 180.1 [b]) was, and is, obviously vague by any accepted standard. Domestic dogs, for instance, that resemble wolves are German Shepherds, Malamutes, Siberian Huskies, and others. From a distance any of those animals may easily be mistaken for a wolf, especially if found in wooded areas, and by that regulation they would be considered wolves, or wolf hybrids, and illegal to own lacking a DEC permit. That would be an absurdity. Also, clearly, the words “difficult or impossible” are conflicting words when used for identification purposes. It cannot be said that it is “difficult” and at the same time that it is “impossible” to do the same thing. Difficult is being uncertain, impossible is definite.
In 1980, the Legislature granted authority to the Department of Environmental Conservation, by amending ECL 11-0511, to control the possession, etc., of wildlife deemed to present potential for harm to the public or to New York’s indigenous wildlife. That section was later amended to include “wolfdog” as one of the restricted animals.
In the case on hand many witnesses were called to testify on behalf of the People, including DEC officers and experts in the field of wolf hybrids. The one most distinguishing feature, that was testified to by all of the experts, was that a wolf, and wolf hybrid, has a gland on its tail approximately three inches down from its back, called a scent gland. No domestic dog has that gland. The animal of defendant, called Arctic, had such a gland. Therefore, it is obvious that Arctic was a wolf hybrid.
However, possession of such gland by an animal is not the criteria under which Arctic was seized. The criteria there is “the overall appearance of which makes it difficult or impossible to distinguish it from a wolf’. (6 NYCRR 180.1.) It was requested, therefore, that the court personally view the animal, being held at the Utica Zoo, which was done at the close of testimony and accompanied by the parties and their attorneys.
The animal was very large, larger than a normal wolf, and light colored, whereas wolves are somewhat darker. Nonetheless, Arctic had the yellow staring eyes distinctive of wolves and at close up the court would have to say that the animal had certain characteristics of a wolf, and it would have been difficult to distinguish it from a wolf. However, from a distance *270 it would not have been difficult to distinguish it from a wolf. It resembled a large dog. Nonetheless, the enforcement officers from DEC who seized Arctic testified that in their opinion the animal had the over-all appearance which made it difficult for them to distinguish it from a wolf. I must then acquiesce to their judgment. In making the arrest the officers first viewed the animal and decided that it had wolf-like characteristics that made it indistinguishable from a wolf or wolf hybrid and seized it. Their decision to seize Arctic was not based on quick judgment but only after consulting with others who were more expert in the field of wolf hybrids and who viewed the animal prior to the arrest.
Many magazine articles have been written about wolf hybrids. In the April 29, 1991 and August 12, 1991 issues of Newsweek, wolfdogs were described as schizophrenic and being predators at heart. In the spring 1991 issue of Wolftracks Magazine, wolves and wolf hybrids were declared to be wild at heart and impossible to domesticate after being wild for thousands of years. In the July/August 1995 Animals Magazine, an article entitled You Can’t Take the Wild Out of Wolves stated that once wolf hybrids reach sexual maturity owners will most likely discover that they have a huge problem on their hands; the wolf dogs vie with each other and their owners for dominance, can leap over most fences, are exceedingly territorial, and can be highly destructive, not to mention dangerous. It stated that since 1986 at least 10 children have been killed by wolf hybrids and another 15 severely mauled in the United States alone. It states that wolf hybrids are born with the strength and instincts of a wild wolf but lacking its habitat the frustrated animals can often break loose and maim or kill other animals and will attack adults as well as children. It further states that in areas where wild wolves exist, escaped hybrids could breed with and genetically erode the wild populations.
In another article appearing in the July/August 1995 issue of Animals Magazine, entitled Wolves, Dogs, and Danger, specific instances, with names and locations, were detailed of children and adults being attacked, maimed, or killed by wolf hybrids, being both owners and strangers to the hybrids. It states that humans are attracted to wolf hybrids because they perceive them as exotic or prestigious to own. People buy wolf hybrids for different reasons, and mostly as pups. However, although believed to be tame and domesticated, by the time the pup reaches sexual maturity it would suddenly change personali *271 ties and seek dominance over adults, children and domesticated animals, and constantly mark its territory. No enclosure was high enough that a hybrid could not scale.
In the June 1994 Smithsonian, which was attached to the legislative history of the miscellaneous regulations herein, a comprehensive analogy of wolf hybrids concluded that possessing a wolf hybrid is a bad decision to make. (See also, Tipton v Town of Tabor, 567 NW2d 351 [SD]; State of Connecticut v DeFrancesco, 235 Conn 426, 668 A2d 348.)
These articles raise serious concern about keeping wolf dogs as pets, particularly in a crowded city. They seem to be attracted mostly to children and will either maim or kill a child if they feel threatened, although adults are not immune to such attacks. They can be a pet one moment and an aggressor the next and it is proper for the laws of the State of New York to protect its citizens and others from wolf hybrids by requiring special permits for their possession.
It is the decision of the court, therefore, that the complaint charging the defendant with possessing a wolf hybrid without a proper permit is dismissed; that officers of the Department of Environmental Conservation had authority to seize Arctic from the defendant, once they had established that in their view the animal was a wolf hybrid, and to expropriate Arctic to the Utica Zoo for its own safety and the safety of the residents of the City of Utica and its surrounding communities, and for indigenous animals, and it is not to be returned to the defendant for those same reasons.