#26832-a-LSW

**2014 S.D. 34**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

| | |
|---|---|
| PRUDENCE MILLEA, as Special Administrator of the Estate of Kimimila Win Sunny Sarah Iron Cloud, (Deceased), | Plaintiff and Appellant, |
| v. | |
| JOLYN R. ERICKSON, | Defendant, |
| and | |
| KELLY LAUGHLIN, Individually and as Property Owner, | Defendant and Appellee. |

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JANINE KERN
Judge

* * * *

| | |
|---|---|
| CHARLES ABOUREZK of Abourezk & Zephier, PC Rapid City, South Dakota | Attorneys for plaintiff and appellant. |
| JANE WIPF PFEIFLE of Lynn, Jackson, Shultz & Lebrun, PC Rapid City, South Dakota | Attorneys for defendant and appellee. |

* * * *

ARGUED ON APRIL 28, 2014
OPINION FILED **06/18/14**

#26832

WILBUR, Justice

[¶1.]          Prudence Millea, special administrator of the estate of Kimimila Win Sunny Sarah Iron Cloud (Kimi), brought a negligence action against both Jolyn Erickson and Kelly Laughlin (Laughlin) for Kimi's death.  Laughlin filed a motion for summary judgment arguing that he had no legal duty to Kimi.  The circuit court granted summary judgment to Laughlin.  We affirm.

### FACTS AND PROCEDURAL BACKGROUND

[¶2.]          In August 2011, Jolyn Erickson, a 2011 high school graduate, lived with her mother, Paula Myers, and her mother's boyfriend, John Laughlin, in an apartment on Lemmon Avenue in Rapid City, South Dakota (Laughlin/Myers apartment).  Laughlin, John Laughlin's son, owned the apartment building on Lemmon Avenue but lived in Gillette, Wyoming.

[¶3.]          On August 2, 2011, Chelsea and O'Neil Iron Cloud asked Erickson to babysit their ten-month-old daughter, Kimi.[1]  It was decided that Erickson would care for Kimi at the Laughlin/Myers apartment.[2]  That same day, Laughlin was in the Rapid City area performing roofing estimates and stopped at the Laughlin/Myers apartment between 4:00 and 4:30 P.M. to have a sandwich and watch television between jobs.  Also during this time, Erickson's friend, Elizabeth Thornton, stopped by to visit Erickson.  Kimi became upset, began to cry, and appeared to be tired.  Erickson was unable to comfort Kimi.  Erickson testified that

---

1.     Erickson had previously provided her babysitting services for the Iron Cloud family.

2.     The Iron Cloud family had recently moved from the Lemmon Avenue apartment complex and was no longer residing there.

she thought that Laughlin was "irritated," "pretty ticked off," or would "freak" because Kimi continued to cry. Laughlin told Erickson that Kimi's crying was giving him a headache.[3] While she did feel "a little bit of stress or pressure" from Laughlin, Erickson testified that Laughlin never made her afraid or anxious. Laughlin suggested to Erickson that Kimi needed a nap.

[¶4.] Erickson testified that Laughlin suggested that Kimi be placed in her car seat to nap. Erickson then placed Kimi in her car seat and buckled her in. Laughlin testified that "it looked like she fastened some - - some portion of it." He further stated that "I definitely know she did the top [buckle]."

[¶5.] Erickson also testified that Laughlin suggested that Kimi be placed in a bedroom. Erickson placed Kimi, who was still in her car seat, in a bedroom and mostly closed the door behind her. While Erickson testified that she respected Laughlin and listened to him when he gave her advice, Erickson testified that at no time was Laughlin in charge of Kimi and that she made all of the decisions concerning Kimi. Erickson testified at several points throughout her deposition:

> **Q.** So even if [Laughlin] had suggested [putting the child in the bedroom], you made the decision what the best thing to do was; is that right?
>
> **A.** Yeah.
>
> . . . .
>
> **Q.** Was there any point when [Laughlin] was in charge of Kimi during this day?
>
> **A.** No.
>
> . . . .
>
> **Q.** Okay. But at no time was [Laughlin] in charge of the baby?

---

3.    In his brief, Laughlin states that "[f]or the purposes of summary judgment only, Laughlin does not dispute Erickson's statements."

**A.** No.

**Q.** And that was your decision, what to do with the baby?

**A.** Yeah.

[¶6.] Laughlin testified that he knew that Kimi was helpless at her age, and that because of her age, she could not be left alone for long periods of time. He also testified that he thought that Kimi, because of her age, should be checked on when sleeping alone in a bedroom.

[¶7.] Laughlin and Thornton left the Laughlin/Myers apartment before 5:00 P.M. When they left, Erickson went to the bathroom, and while there, heard a loud noise. Erickson went to the bedroom and observed that the car seat had tipped forward and Kimi appeared to be lifeless. The bottom buckle of the car seat was not latched, which then allowed the child to slip forward and catch her neck on the upper strap. Erickson administered CPR and called 911. Kimi died from positional asphyxiation.

[¶8.] Millea, as special administrator for Kimi's estate, brought a negligence action against both Erickson and Laughlin for Kimi's death. Erickson never answered the complaint and a default judgment was entered against her. Laughlin filed a motion for summary judgment arguing that he had no legal duty to Kimi. The circuit court granted summary judgment to Laughlin. Millea appeals arguing that the circuit court erred in granting summary judgment to Laughlin.

## STANDARD OF REVIEW

[¶9.] The standard of review of a summary judgment is well-settled. We "determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter

of law." *Andrushchenko v. Silchuk*, 2008 S.D. 8, ¶ 8, 744 N.W.2d 850, 854 (quoting *Kling v. Stern*, 2007 S.D. 51, ¶ 5, 733 N.W.2d 615, 617). "All facts and favorable inferences from those facts must be viewed in a light most favorable to the nonmoving party." *Id.* (quoting *Hendrix v. Schulte*, 2007 S.D. 73, ¶ 6, 736 N.W.2d 845, 847). "However, the nonmoving party must 'present more than unsupported conclusions and speculative statements, which do not raise a genuine issue of fact.'" *Id.* (quoting *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 34, 737 N.W.2d 397, 408). "Summary judgment is proper in negligence cases if no duty exists as a matter of law." *First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton*, 2008 S.D. 83, ¶ 13, 756 N.W.2d 19, 25-26 (quoting *Stone v. Von Eye Farms*, 2007 S.D. 115, ¶ 6, 741 N.W.2d 767, 770). As a general matter, the existence of a duty is a question of law that is reviewed de novo. *Id.*

**DECISION**

[¶10.]     Millea contends that Laughlin interfered with Erickson's care of Kimi when Laughlin instructed Erickson to place Kimi in her car seat and in the bedroom so that Kimi could nap. She asserts that based on the familial-like relationship between Laughlin and Erickson, Laughlin had influence over Erickson such that Erickson deferred to Laughlin in providing care for Kimi. Millea argues that by this affirmative interference in Kimi's care, Laughlin assumed a legal duty to provide reasonable care for Kimi. Millea asserts that this duty either superseded Erickson's duty or joined with Erickson in a concurrent duty.

[¶11.]     "In order to maintain a negligence action and before a defendant can be found negligent, a plaintiff must prove a duty existed from the defendant to the

plaintiff." *Hoekman v. Nelson*, 2000 S.D. 99, ¶ 8, 614 N.W.2d 821, 823. "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Id.* (quoting *Tipton v. Town of Tabor*, 1997 S.D. 96, ¶ 12, 567 N.W.2d 351, 357).

[¶12.]    "In determining whether a duty exists, we examine whether 'a relationship exists between the parties such that the law will impose upon the defendant a legal obligation of reasonable conduct for the benefit of the plaintiff.'" *First Am. Bank & Trust*, 2008 S.D. 83, ¶ 16, 756 N.W.2d at 26 (quoting *Casillas v. Schubauer*, 2006 S.D. 42, ¶ 14, 714 N.W.2d 84, 88). "Additionally, a duty can be created by common-law or statute." *Id.*

### I. Statutory Duty

[¶13.]    Millea directs this Court to SDCL 20-9-1, which Millea claims imposed a duty upon Laughlin to provide reasonable care to Kimi. SDCL 20-9-1 provides: "Every person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill, subject in the latter cases to the defense of contributory negligence." In examining SDCL 20-9-1, we have previously said that "[t]his statute is 'a simple codification of the common law of negligence.'" *Wildeboer v. S.D. Junior Chamber of Commerce, Inc.*, 1997 S.D. 33, ¶ 13, 561 N.W.2d 666, 669 (quoting *In re Certif. of Questions of Law (Knowles v. United States)*, 1996 S.D. 10, ¶ 21, 544 N.W.2d 183, 188 (superseded by statute on other grounds as stated in *Peterson ex rel. Peterson v. Burns*, 2001 S.D. 126, ¶ 37, 635 N.W.2d 556, 570)). SDCL 20-9-1 "simply recognizes the right of

injured persons to recover from wrongdoers who fail to exercise ordinary care. It does not define the circumstances under which the law imposes a duty on an alleged tort-feasor[.]" *Poelstra v. Basin Elec. Power Co-op.*, 1996 S.D. 36, ¶ 13, 545 N.W.2d 823, 826.

[¶14.]    Millea has not provided this Court with any other authority to support her contention that SDCL 20-9-1 imposes a duty upon Laughlin to provide care to Kimi[4] and the statute does not define the circumstances under which the law imposes a duty on Laughlin. Therefore, SDCL 20-9-1 does not provide a basis for the imposition of the alleged duty in this case.

## II. Common Law Duty

[¶15.]    In addition, Millea directs this Court to common law to support her contention that Laughlin had a duty to care for Kimi. This Court has recognized that "there is no general duty to come to the assistance of a person [who is] . . . unable to look out for himself[.]" *Erickson v. Lavielle*, 368 N.W.2d 624, 627 (S.D. 1985) (quoting *Steckman v. Silvermoon*, 77 S.D. 206, 211, 90 N.W.2d 170, 173 (1958)). "[O]nce a person . . . undertakes to render assistance[, however], the law imposes on him the duty of reasonable care toward the assisted." *Id.*

---

4.    In her reply brief, Millea contends *Thompson v. Summers* supports her argument that SDCL 20-9-1 imposed a duty on Laughlin, because the case "cited to and relied upon this statutory section." 1997 S.D. 103, 567 N.W.2d 387. We note that the Court in *Thompson*, like in *Poelstra,* was merely acknowledging that SDCL 20-9-1 was the codification of the common law of negligence. *Id.* ¶ 13, 567 N.W.2d at 392. In citing to SDCL 20-9-1, the Court in *Thompson* did not provide for the circumstances under which the law would impose a duty on an alleged tortfeasor, such as Laughlin. Millea's argument that SDCL 20-9-1 and *Thompson* provide authority to impose a duty of care on Laughlin is unpersuasive.

*Special Relationship*

[¶16.]     Millea contends that Laughlin had a special relationship with Kimi that gave rise to a duty to provide care or aid under Restatement (Second) of Torts section 314A, subsection four. A special relationship exists under subsection four of the Restatement (Second) of Torts section 314A when a person "who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." *Erickson*, 368 N.W.2d at 627 (quoting Restatement (Second) of Torts § 314A (1965) (emphasis omitted)).

[¶17.]     This subsection of the Restatement does not apply to impose a duty on Laughlin to care for Kimi. Based on the facts in this case, viewed in a light most favorable to Millea, Erickson, and not Laughlin, made all decisions regarding Kimi's care. Erickson testified that Laughlin was never in charge of the child nor did Laughlin agree to supervise the child. Laughlin did not, himself, place the child in the car seat nor did he place the car seat in the bedroom, but rather, Erickson made these decisions. Other than an argument that Laughlin, because of his age and quasi-stepbrother-like role to Erickson, asserted authority over Erickson, and thus took over Kimi's care, Millea does not support her allegation with fact. *See Andrushchenko*, 2008 S.D. 8, ¶ 8, 744 N.W.2d at 854 (stating that "the nonmoving party must 'present more than unsupported conclusions and speculative statements, which do not raise a genuine issue of fact'") (quoting *Burley*, 2007 S.D. 82, ¶ 34, 737 N.W.2d at 408)). The undisputed facts demonstrate that while Laughlin made suggestions and Erickson respected Laughlin and listened to him

when he gave her advice, Erickson testified that at no time was Laughlin in charge of Kimi and that Erickson made all of the decisions concerning Kimi's care. Thus, a special relationship between Laughlin and Kimi under Restatement (Second) of Torts section 314A, subsection four did not exist.

*Gratuitous Duty*

[¶18.] Millea cites to two sections of the Restatement—sections 323 and 324—to support her argument that Laughlin gratuitously undertook a duty of care to Kimi when he intervened in the care of the child. Millea asserts that Kimi, as an infant, was helpless, and that by undertaking this duty, Laughlin changed the care that Erickson was providing for Kimi.

[¶19.] "South Dakota recognizes the common law doctrine of gratuitous duty." *Id.* ¶ 24, 744 N.W.2d at 858. We previously adopted the common-law gratuitous-duty rule, which is defined in Restatement (Second) of Torts § 323:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if,
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* (quoting Restatement (Second) of Torts § 323 (1965)). Additionally, section 324, an application of section 323, provides:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by

> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
>
> (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

Comment a to section 324 states that the particular feature of section 324 "is that the plaintiff is in a helpless position, which is an important factor in determining whether the actor may discontinue the aid or protection which he has undertaken to give." Restatement (Second) of Torts § 324 cmt. a (1965).

[¶20.]     The facts, viewed in the light most favorable to Millea, do not support an implied or express undertaking of a gratuitous duty by Laughlin for the care and responsibility of Kimi. Indeed, Erickson never expressly or impliedly relinquished her duty to care for Kimi to Laughlin. *See Andrushchenko*, 2008 S.D. 8, ¶¶ 24-25, 744 N.W.2d at 858-59.[5] Erickson testified that she was in charge of the child and

---

5.     Laughlin cites to this Court's decision in *Andrushchenko v. Silchuk*, 2008 S.D. 8, 744 N.W.2d 850, to support his argument that he did not undertake a gratuitous duty to care for Kimi. In *Andrushchenko*, the Silchuks invited the Andrushchenkos and their three-year old son, D.A., over to their home. *Id.* ¶ 2, 744 N.W.2d at 853. At some point during the visit, Mrs. Silchuk went upstairs and noticed that D.A. was not playing with the other children. *Id.* He was playing by himself in another area of the room. *Id.* Mrs. Silchuk returned to the main floor, but did not bring D.A. downstairs with her nor report to D.A.'s parents that D.A. was playing alone upstairs. *Id.* A short time later, the adults heard a scream and discovered that D.A. had turned on the hot water in the bathtub, climbed or fell in, and scalded himself. *Id.* D.A.'s parents sued Silchuks for negligence claiming that the Silchuks owed D.A. the duty of ordinary and reasonable care because of his status as an invitee and because of a gratuitous duty undertaken by Mrs. Silchuk to protect D.A. *Id.* ¶ 4. The circuit court entered summary judgment as to all defendants and this Court affirmed. *Id.* ¶¶ 6, 28-29, 744 N.W.2d at 854, 859. As to gratuitous duty, the Court determined that "[t]he Andrushchenkos never expressly or impliedly relinquished their obligation to supervise D.A." *Id.* ¶ 24, 744 N.W.2d at 859 (citing *Sunnarborg v. Howard*, 581 N.W.2d 397,

(continued . . .)

that she made the decisions regarding her care. Laughlin was never in charge of Kimi. Again, Millea only makes a general argument that Laughlin, because of his age and quasi-stepbrother-like role to Erickson, asserted authority over Erickson and thus took over Kimi's care from Erickson. This argument does not, however, raise a genuine issue of material fact. *See id.* ¶ 8, 744 N.W.2d at 854 (quoting *Burley*, 2007 S.D. 82, ¶ 34, 737 N.W.2d at 408). Moreover, the undisputed facts demonstrate that Erickson was not anxious or afraid of Laughlin, and that while Laughlin may have sounded irritated or made suggestions to her, Erickson testified that at no time was Laughlin in charge of Kimi and that she made all of the decisions concerning Kimi. Thus, Laughlin did not impliedly or expressly undertake a gratuitous duty to care for Kimi.

## CONCLUSION

[¶21.] Laughlin had no legal duty to care for Kimi. We affirm the circuit court's grant of summary judgment in favor of Laughlin.

---

(. . . continued)

399 (Minn. Ct. App. 1998) (stating "the responsibility for supervision of such child may be relinquished or obtained only upon mutual consent, express or implied, by the one legally charged with the care of the child and by the one assuming the responsibility")). The Court also noted that D.A.'s parents were present during the entire visit and were primarily responsible for D.A.'s care. *Id.* ¶ 25 (citing *O.L. v. R.L.*, 62 S.W.3d 469, 475 (Mo. App. W.D. 2001) (providing that it is the "acceptance of the custody and control of a minor child [that] creates a relationship sufficient to support a duty of care")).

Laughlin, like Mrs. Silchuk, never undertook a gratuitous duty to care for Kimi. Kimi's care was solely the responsibility of Erickson. Erickson never expressly or impliedly relinquished her obligation. Thus, this Court's decision in *Andrushchenko* is instructive as to the outcome of the present appeal.

#26832

[¶22.]　　　GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and

SEVERSON, Justices, concur.